Lieutenant Colonel Raymond **SAUNDERS Plaintiff,**

v.

**Thomas E. WHITE, Secretary of the Army, Defendant.**

**No. CIV.A.99–2807 (RCL).**

United States District Court, District of Columbia.

March 4, 2002.

---

Christopher Alexander Sterbenz, Vienna, VA, for Plaintiff.

Vincent Morgan Garvey, Peter Baker Robbins, David Michael Glass, U.S. Department of Justice Civil Div., Washington, DC, for Defendant.

## MEMORANDUM OPINION

LAMBERTH, District Judge.

On March 19, 2001, the Court granted in part and denied in part the defendant's motion to dismiss the plaintiff's original complaint. Thereafter, the plaintiff amended his complaint. Now the defendant again seeks dismissal, or in the alternative, summary judgment. In addition, the plaintiff has moved for summary judgment on the issue of liability. Specifically, the plaintiff claims that as a matter of law the defendant's use of racial and gender classifications in its promotion policy violated his Fifth Amendment rights and that the only issue left for the Court to resolve concerns fashioning an appropriate remedy. After a full review of the parties' memoranda, the applicable law, and for the following reasons, the Court DENIES in part and GRANTS in part the defendant's motion and DENIES in part and GRANTS in part the plaintiff's motion.

## I. BACKGROUND

The facts of this case have already been fully recounted in the Court's March 19, 2001 Memorandum Opinion. For the present purposes, it enough to state that the plaintiff is a white male who is on retired status in the United States Army. He is ranked as a lieutenant colonel and,

during the years 1996 and 1997, he sought promotion to the rank of colonel. In each instance, he was denied promotion.

On October 25, 1999, the plaintiff filed this action alleging that his failure to be promoted was due to the Army's equal opportunity policy. His complaint clearly alleged that the Army's policy was unconstitutional both facially and as applied. See Amended Complaint, Mar. 19, 2001 (stating that the defendant's equal opportunity instructions "both as set forth in writing and as actually interpreted and executed" violated the plaintiff's constitutional rights.)

On March 31, 2000, the Army moved to dismiss LTC Saunders' original complaint on several standing and mootness grounds. As such, the Army did not address whether the equal opportunity policy was, on its face, unconstitutional. The Court granted in part and denied in part the Army's motion. Specifically, the Court dismissed Saunders' claims for prospective relief on the ground that he, as a retired officer, had no standing to seek such relief.[1] With respect to Saunders' retrospective claims, the Court found that Saunders had properly stated a claim.

Thereafter, the plaintiff amended his complaint. He added an allegation that he was denied "equal protection of the laws [through the use of] racial and sexual classifications in [the] composition of the [promotion] selection boards." Amended Complaint, at 7.

In response to Saunders' amended complaint, the Army moved to dismiss, or in the alternative, for summary judgment. Aside from its argument against the selection board composition claim, the Army advances several different arguments:

---

1. In its March 19, 2001 Opinion, the Court dismissed the plaintiff's claim for prospective relief. See Memorandum Opinion, Mar. 19, 2001, at 9.

(1) Saunders' claim with respect to the 1996 selection board should be dismissed because the equal opportunity policy did not discriminate on the basis of race or gender;

(2) Saunders' claim with respect to the 1997 selection board should be dismissed because

 (a) his claim was mooted by the convening of a special selection board,

 (b) he would not have been promoted even in the absence of the equal opportunity policy, and

 (c) the Army's behavior is justifiable under a standard of intermediate scrutiny.

## II. ANALYSIS

### A. The Defendant's Motion to Dismiss the Plaintiff's Selection Board Membership Claim

#### 1. Standard of Review for a Motion to Dismiss

If a plaintiff has failed "to state a claim upon which relief can be granted," a court may grant a defendant's motion to dismiss. Fed.R.Civ.P. 12(b)(6); *see also Hishon v. King Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984); *Sparrow v. United Air Lines, Inc.,* 216 F.3d 1111, 1114 (D.C.Cir.2000). In evaluating a motion to dismiss, a court must construe the complaint in the light most favorable to the plaintiff and give the plaintiff "the benefit of all inferences that can be derived from the facts alleged." *Schuler v. United States,* 617 F.2d 605, 608 (D.C.Cir.1979); *see also Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). "However, legal conclusions, deductions or opinions couched as factual allegations are not given a presumption of truthfulness." *Wiggins v. Hitchens,* 853 F.Supp. 505, 508 n. 1 (D.D.C.1994) (citing 2A Moore's Federal Practice, § 12.07, at 63 (2d ed.1986)

(footnote omitted); *Haynesworth v. Miller,* 820 F.2d 1245, 1254 (D.C.Cir.1987)).

#### 2. The Defendant's Motion

As the plaintiff's amended complaint is identical to the plaintiff's original complaint in all respects save one, few words are needed to resolve the defendant's motion. The only issue presented in the instant motion that was not addressed by the Court's March 19, 2001 Opinion is the issue of selection board composition. On this issue, the Court finds that the plaintiff is without standing to facially challenge the selection board composition, but may proceed with an as applied claim. *See Ward v. Caldera,* 138 F.Supp.2d 1 (D.D.C. 2001).

■ To have jurisdiction over a case, a court must find there to be "a causal relationship between the [plaintiff's] injury and the challenged conduct." *Northeastern Fla. Chapter of the Associated Gen. Contractors of Am. v. City of Jacksonville,* 508 U.S. 656, 663, 113 S.Ct. 2297, 124 L.Ed.2d 586 (1993). In the case at hand, there is no such relationship between the defendant's membership policy and the plaintiff's non-promotion. The Court recently explained its reasoning at length in *Ward v. Caldera:*

> To hold [in favor of the non-promoted plaintiff] would be to hold that every time "one or more females and one or more members of racial groups other than Caucasian" are placed on a selection board, the collective promotion decisions of the selection board are unavoidably altered. Such a conclusion would necessarily include two presumptions. First, that all women and non-whites have an inherent and unavoidable disposition to favor their own race and gender. And second, that all promotion decisions by selection boards are con-

trolled by the voting habits of a few women and non-whites.

The first presumption is not just patently false, it is diametrically opposed to Supreme Court jurisprudence which this Court is bound to follow. The Supreme Court has consistently shunned such racial and gender stereotypes, and, in any event, has never held that a decision-maker's race or sex, by itself, prevents her from making an objective decision.

The second presumption behind the plaintiff's claim is completely devoid of logic. While it is reasonable to assume that women and non-whites, together with the other members of selection boards, inform the decisions of the board, it is patently unreasonable to assume that a few members, constituting a numerical minority of the board, can control the outcome of the board's decisions. Thus, even if women and non-whites were possessed of the class narcissism which the plaintiff implies, there is no reason to think they would be successful in converting the rest of the board to their views.

Of course, there exists the possibility (though it is a slight one for sure) that a particular woman or minority, possessed of both class narcissism and Machiavellian powers of persuasion, could pull off a coup of racial or gender discrimination against a particular applicant. But the mere possibility of this is a far cry from the necessity that, in a facial challenge, the plaintiff "establish that no set of circumstances exists under which the [policy] would be valid."

*Ward,* 138 F.Supp.2d at 8–9 (citations omitted).

Regarding selection board composition, the instant case presents the same material facts as *Ward v. Caldera.* Thus, the Court finds that the plaintiff's facial challenge to the policy must fail.[2] The plaintiff, however, may continue to pursue an as-applied challenge; that is, an allegation that the 1996 and 1997 selection boards that considered his promotion intended to discriminate against him. As the Court recognized in *Ward,*

> the plaintiff in this case might, in accordance with his duty to demonstrate a discriminatory purpose under *Washington v. Davis,* 426 U.S. 229, 242, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), utilize the selection board membership, together with other evidence such as the promotion rate for certain races and genders, to persuade the Court that he has been discriminated against.

*Ward,* 138 F.Supp.2d at 9. Thus, although the Court holds that board membership *itself* is not conclusive (or even probative) as to discrimination, the individual identities of board members may, of course, play a role in discrimination.

## B. The Plaintiff's Standing to Seek Retrospective Relief

Before reaching the merits of a particular claim, a federal court must assure itself that it has jurisdiction over the case. *See FW/PBS Inc. v. Dallas,* 493 U.S. 215, 231, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990) (noting that "the federal courts are under an independent obligation to examine their own jurisdiction, and standing 'is perhaps the most important of the jurisdictional doctrines.'"); *Whitmore v. Arkansas,* 495 U.S. 149, 155, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990) (same); *Warth v. Seldin,* 422 U.S. 490, 95 S.Ct.

---

2. The plaintiff's intent to facially challenge the board composition policy is evinced by the plaintiff's prayer for relief. Therein, he asks that the Court declare that "the Defendant's use of racial and sexual classifications in the composition of his officer selection boards violated the Fifth Amendment to the United States Constitution." Amended Complaint, at 9.

2197, 45 L.Ed.2d 343 (1975) (same). In order for a court to have jurisdiction over a case, the plaintiff bringing the suit must have standing to raise the claims asserted therein. *Northeastern Fla. Chapter of the Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 663, 113 S.Ct. 2297, 124 L.Ed.2d 586 (1993) (recognizing that "[t]he doctrine of standing is an essential and unchanging part of the case-or-controversy requirement of Article III[.]"). Courts should not, however, consider the merits of the plaintiff's claim in determining whether he has standing to bring the lawsuit. *Warth*, 422 U.S. at 500, 95 S.Ct. 2197 (recognizing that "standing in no way depends on the merits of the plaintiff's contention that particular conduct is illegal"); *Whitmore*, 495 U.S. at 155, 110 S.Ct. 1717 (stating that "we thus put aside for now Whitmore's Eighth Amendment challenge and consider whether he has established the existence of a 'case or controversy.'"). In fact, "[f]or purposes of ruling on a motion to dismiss for want of standing, both the trial and reviewing courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Warth*, 422 U.S. at 501, 95 S.Ct. 2197; *AFL–CIO v. Pierce*, 697 F.2d 303, 305 (D.C.Cir.1982) (noting that "[f]or purposes of the standing issue, we accept as valid Congressman Sabo's pleaded legal theory."). As the Court has already dismissed the plaintiff's claims for prospective relief, the Court is now presented with the interesting and uncommon question of what showing a plaintiff seeking retrospective relief must make to obtain the jurisdiction of this Court.[3] The Court enunciates this showing below and finds that the plaintiff has met its requirements.

### 1. The Plaintiff's Injury in Fact

In order to have standing a plaintiff must demonstrate that: (1) he has suffered an injury that is both (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to (or caused by) the conduct of which he complains; and (3) the injury is likely to be redressed by a court decision in his favor. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992); *Skaggs v. Carle*, 110 F.3d 831, 834 (D.C.Cir.1997). While all three of these elements must be satisfied in order for a plaintiff to have standing, "the central focus is fixed on the injury requirement." Wright, Miller, and Cooper *Federal Practice and Procedure* 418 (1984). The reason that the injury component of this tripartite test is particularly important is because without first determining

---

**3.** The Court's finding that the plaintiff lacks standing to seek prospective relief does not preclude the plaintiff from seeking (or having standing to seek) retrospective relief. *Friends of the Earth, Inc., v. Laidlaw Environmental Servs.*, 528 U.S. 167, 185, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000) (noting that the standing inquiry is dependent on the relief sought.); *Lewis v. Casey*, 518 U.S. 343, 358, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996) (stating that "standing is not dispensed in gross."). For instance, in *Los Angeles v. Lyons*, 461 U.S. 95, 109–11, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983), the Supreme Court recognized that even though the plaintiff lacked standing to obtain prospective relief in his civil rights action against the city, he had standing to pursue retrospective damages. Erwin Chemerinsky, *Federal Jurisdiction* 63 (1994) (noting that the "Court did not deny [the plaintiff's] standing to pursue a damages claim and the constitutionality of the chokehold could be adjudicated there."). Moreover, in *Adarand Constructors v. Pena*, 515 U.S. 200, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995), the Supreme Court noted—before considering whether the plaintiff had standing to seek prospective relief—that "Adarand's allegation that it has lost a contract in the past of course entitles it to seek damages for the loss of that contract." *Adarand Constructors*, 515 U.S. at 210, 115 S.Ct. 2097.

the precise injury that a plaintiff has suffered or will suffer, it is impossible for a court to ascertain whether the remaining two requirements—causation and redressability—have been met. Indeed, there is no question that the manner in which the plaintiff's injury is defined will necessarily impact whether the injury is "fairly traceable" to the actions of the defendant and whether the injury can be "redressed" by a favorable decision of the court. Thus, in enunciating the showing that a plaintiff seeking retrospective damages has to make in order to have standing, the Court must begin by determining what the "injury" is in this type of case.

### a. Inability to Compete on an Equal Footing

■ When a plaintiff challenging an allegedly discriminatory[4] governmental policy seeks prospective relief, the plaintiff "need not allege that he would have obtained the benefit but for the [discriminatory policy] in order to establish standing." *Northeastern Fla.*, 508 U.S. at 666, 113 S.Ct. 2297. Rather, the " 'injury in fact' in an equal protection case of this variety is the denial of equal treatment resulting from the imposition of the [discriminatory policy], not the ultimate inability to obtain the benefit." *Id.* (noting that "in the context of a challenge to a set-aside program, the 'injury in fact' is the inability to compete on an equal footing in the bidding process, not the loss of a contract."). *See also Adarand Constructors*, 515 U.S. at 211, 115 S.Ct. 2097 (same). Thus, for a

plaintiff seeking prospective relief to suffer an injury for purposes of standing, he only needs to demonstrate that he is ready and able to apply (or be considered) for a benefit and that a discriminatory policy prevents him from doing so on an equal basis. *Id.* Moreover, based on this definition of injury in fact, it is relatively easy for a plaintiff to demonstrate both that the discriminatory policy is the 'cause' of his injury and that a judicial decree directing the government to discontinue its program would 'redress' the injury. *See, e.g., Northeastern Fla.*, 508 U.S. at 666, 113 S.Ct. 2297.

Some courts have also applied the "inability to compete on an equal footing" standard in cases where the plaintiff seeks retrospective relief. *See, e.g., Wooden v. Board of Regents of the University System of Georgia*, 247 F.3d 1262 (11th Cir.2001);[5] *Buchwald v. University of New Mexico School of Medicine*, 159 F.3d 487 (10th Cir.1998). For example, the plaintiffs in *Wooden*, who unsuccessfully sought admission to the University of Georgia, alleged that the university's freshman admissions policy illegally favored non-white applicants. *Wooden*, 247 F.3d at 1264. The Eleventh Circuit began its discussion of standing by explicitly citing cases such as *Northeastern Florida* and *Adarand Constructors* for the proposition that "when a plaintiff competing for a government-sponsored benefit has been treated differently because of race, he has standing to challenge that differential treatment because his application has not been considered on

---

4. By using the term "discriminatory," the Court means that the policy "erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group." *Northeastern Fla.*, 508 U.S. at 666, 113 S.Ct. 2297.

5. With respect to one particular plaintiff, Craig Green, the court explicitly declined to determine whether he had standing to seek prospective relief. *Wooden*, 247 F.3d at 1281

n. 17 (noting that "[i]t is unclear whether Green desires such relief or can establish the additional elements necessary to have standing to seek such relief."). The court did find, however, that another plaintiff, Kirby Tracy, did not have standing to seek prospective relief because he failed to "show a sufficient likelihood that he will be affected by the allegedly unlawful conduct in the future." *Id.* at 1283–84.

an equal footing with applications from members of the favored racial group." *Id.* at 1274–76. Based on this definition of injury in fact, the court concluded that:

the critical inquiry for standing purposes [is] whether the plaintiff's application has *actually* been treated differently at some stage in the admissions process on the basis of race. If so, then the plaintiff has not competed on an equal footing with other applicants outside his racial classification, and standing should be conferred regardless of whether race is ultimately a factor in the decision to reject the application. Conversely, if the plaintiff's application is never actually treated differently because of race, then the fact that race may be a consideration in assessing other applicants at a different stage of the process should not by itself confer standing.

*Id.* at 1278 (emphasis in original).[6] The court further held that to the extent the injury is differential treatment, "that injury was unquestionably caused by" the University and the "court could redress that injury" in a number of ways. *Id.* at 1281. Moreover, in *Buchwald,* the plaintiff, who unsuccessfully sought admission to the University of New Mexico School of Medicine, alleged that the school's admissions process illegally favored long-term residents. Again, relying on cases like *Northeastern Florida,* the Tenth Circuit found that:

[i]njury in fact in an equal protection case like this may simply be the existence of a government-erected barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group. It is not necessary for the plaintiff to show that she *would* have received the benefit but for the operation of the policy, because the injury is the imposition of the barrier itself. Here defendants admit favoring long-term over short-term residents, all other qualifications being equal, which by itself is therefore a sufficient demonstration of injury in fact. Because it is clear that defendant's stated policy 'caused' the plaintiff to compete at a disadvantage vis-à-vis long term residents, we have little doubt that, were the district court to award damages, plaintiff's injury would likely be redressed.

*Buchwald,* 159 F.3d at 493.[7] It is important to note that, under this standard, plaintiffs who were not actually subjected to different treatment—that is, plaintiffs who competed on an equal footing—lack standing since they failed to suffer an injury in fact. *Wooden,* 247 F.3d at 1282–83 (finding that "a white applicant knocked out at the first stage of the UGA admissions process based on purely race-neutral criteria—as part of an entirely race-neutral inquiry into objective qualifications—cannot claim to have been denied an opportunity to compete 'on an equal footing' with non-white applicants."); *Donahue v. City of Boston,* 2001 WL 1682613 (D.Mass.

---

**6.** In making this decision, the court rejected the university's contention that "for a white applicant to claim that he has been denied an opportunity to compete on an equal footing with non-white applicants, he necessarily must show that he is, in fact, able to compete equally." *Wooden,* 247 F.3d at 1278.

**7.** The court went on to find that since "a genuine issue of material fact [existed] as to whether the disputed preference was the dis-

positive factor for plaintiff's rejection, plaintiff also has standing to seek a[n] injunction ordering her admission to the school." *Buchwald,* 159 F.3d at 493. At the same time, however, the court held that Buchwald did not have standing to seek a permanent injunction prohibiting the medical school from considering duration of residency in future admissions decisions because she failed to show (or even allege) that she was going to re-apply in the future. *Id.* at 493–94.

December 13, 2001) (stating that "[t]he undisputed facts demonstrate that Donahue's test scores and lack of statutory preference doomed his candidacy to failure before the consent decree came into play. Because Donahue has no injury, he has no standing.").

### b. Actual Denial of the Benefit

▮ In contrast, other courts have found that when a plaintiff seeks retrospective relief the "injury in fact" is the actual denial of the benefit rather than the inability to have competed for the benefit on an equal footing.[8] *Yeager v. General Motors Corp.*, 265 F.3d 389, 395 (6th Cir. 2001);[9] *Comfort v. Lynn School Committee*, 150 F.Supp.2d 285, 299–301 (D.Mass. 2001) (noting that "standing to claim compensatory relief requires a plaintiff to show that he would receive the benefit in question were race not considered, whereas to claim equitable relief, a showing of inability to compete on an equal footing will suffice."); *Sims v. Ware*, 1999 WL 637226 at *2 (N.D.Texas August, 20, 1999) (finding "that the plaintiffs have failed to meet this fundamental standing requirement as complete eradication of the affirmative action plan would not result in promotion to the rank of Senior Corporal for these seven Baird plaintiffs."). For exam-ple, in *Yeager*, the plaintiff, who was not admitted into General Motors Corporation's apprentice program, alleged that the apprentice program (which included a pre-apprentice training program) impermissibly favored minority and female candidates. In affirming the district court's determination that Yeager lacked standing to bring the suit, the Sixth Circuit found that "Yeager was not injured within the meaning of Article III because GMC hired fifty apprentices in 1996 and fifty candidates with higher unadjusted scores out-ranked Yeager." *Yeager*, 265 F.3d at 395. That is, the court found that Yeager did not suffer an injury in fact—and therefore he lacked standing—because he would have been rejected even under race and gender neutral criteria. *Id. Cf. McNamara v. Chicago*, 138 F.3d 1219, 1221 (7th Cir.1998) (noting that "[h]ad there been no favoritism, the six low-ranking plaintiffs would not have been promoted, because promotions would have stopped at 146 and the highest-ranking of these plaintiffs was as we said number 152. A plaintiff who would have been no better off had the defendant refrained from the unlawful acts of which the plaintiff is complaining does not have standing under Article III of the Constitution to challenge those acts in a suit in federal court.").[10]

8. It is important to note that the failure to be promoted is a sufficiently concrete injury for purposes of standing. *Patterson v. McLean Credit Union*, 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989) (abrogated on other grounds by the Civil Rights Act of 1991); *Hase v. Missouri Div. of Employment Sec.*, 972 F.2d 893 (8th Cir.1992).

9. The plaintiff in this case seems to have been seeking both retrospective and prospective relief. Specifically, the district court observed that the plaintiff had a "monetary demand" and the Sixth Circuit noted that he was also seeking an injunction against General Motors Corporation. In each instance the courts appear to treat the "injury" as the failure to ultimately obtain the benefit.

10. In *McNamara*, the Seventh Circuit concluded, however, that "[t]hat appears to be (but, as we are about to see, may not be) the situation of these six plaintiffs." *McNamara*, 138 F.3d at 1221. The difficulty in the determining these plaintiffs' standing to bring suit was that they were seeking damages for emotional distress. The court observed that it is unclear whether "a person denied a benefit on an invidious ground may obtain damages for emotional distress caused by that denial even if he would have been denied the benefit anyway." *Id.* at 1222. Ultimately, the court resolved the matter without ruling on the plaintiffs' standing to bring the suit. *Id.*

Even if the injury in fact is the actual denial of a benefit rather than the inability to have competed for it on an equal footing, however, plaintiffs do not have to show—at least in employment discrimination cases—that they would have received the benefit absent the discriminatory policy. As Judge Posner, writing for the Seventh Circuit, explained in *Doll v. Brown:*

> The plaintiff in an ordinary tort case must prove not only that the defendant committed a wrongful act but also that the act injured the plaintiff, that is, made him worse off than he would have been had the defendant not acted. Both wrong and injury are elements of the plaintiff's case, which he thus must prove by a preponderance of the evidence, because, as we tirelessly repeat ... there is no tort without an injury. But, in the case of the statutory and constitutional torts of employment discrimination, the Supreme Court has held that the burden of proof on the issue of injury rests on the employer, the defendant, rather than the employee, the plaintiff.

*Doll,* 75 F.3d 1200, 1202 (7th Cir.1996). *See also Bishop v. Gainer,* 272 F.3d 1009, 1016 (7th Cir.2001) (agreeing with the district court's conclusion that "[i]t is defendants who bear the burden of establishing that plaintiffs would not have been promoted irrespective of any racial or gender discrimination.").

 In employment discrimination cases where the plaintiff challenges an employer's decision as being based on illegal as well as legal factors, the injury that the plaintiff has to allege (and, in fact, ultimately prove) is that the impermissible reason was a motivating or substantial factor in the employment decision. *Price Waterhouse v. Hopkins,* 490 U.S. 228, 241, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) (finding that "[w]hen, therefore, an employer considers both gender and legitimate factors at the time of making a decision, that decision was 'because of' sex and the other, legitimate considerations—even if we may say later, in the context of litigation, that the decision would have been the same if gender had not been taken into account."); *Thomas v. NFL,* 131 F.3d 198, 202–03 (D.C.Cir.1997) (recognizing that "[a] plaintiff asserting mixed motives must persuade the trier of fact by a preponderance of the evidence that [an] unlawful [factor] constituted a substantial factor in the defendant's action.").[11] As the Supreme Court stated in *Price Waterhouse,* which was a Title VII action based on gender discrimination, "our assumption always has been that if an employer allows gender to affect its decisionmaking process, then it must carry the burden of justifying its ultimate decision. We have not in the past required women whose gender has proved relevant to an employment decision to establish the negative proposition that they would not have been subject to that decision had they been men, and we do not do so today." *Price Waterhouse,* 490 U.S. at 248, 109 S.Ct. 1775 (stating that the "critical inquiry ... is whether gender was a factor in the

---

**11.** In contrast, "where a plaintiff argues that discriminatory motivation constituted the *only* basis for the employer's action, the plaintiff may persuade the trier of fact of the pretextual nature of the defendant's asserted reason 'either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Thomas,* 131 F.3d at

198. *See also Haskins v. Department of the Army,* 808 F.2d 1192, 1197 (6th Cir.1987) (noting that "[i]n a non-dual motive case, where the issue is which of two alternate reasons is the 'true' reason for the adverse employment action, the ... plaintiff has the burden of persuasion to establish that the unlawful motive was more likely than not the basis of the employer's decision.").

employment decision *at the moment it was made.*") (emphasis in original); *Toney v. Block* 705 F.2d 1364, 1366 (D.C.Cir.1983) (noting that "in such circumstances it is unreasonable and destructive to the purposes of Title VII to require the plaintiff to establish in addition the difficult hypothetical proposition that, had there been no discrimination, the employment decision would have been made in his favor.").[12] In applying this standard to employment discrimination suits, the Court explicitly cited cases in other contexts, such as *Mt. Healthy City Board of Education v. Doyle,* for the proposition that the plaintiff only has to show that an illegal motive was "a 'substantial' or 'motivating factor' in the adverse treatment of him by his employer." *Price Waterhouse,* 490 U.S. at 248–49, 109 S.Ct. 1775. Moreover, the Court further noted that "[i]n saying that gender played a motivating part in an employment decision, we mean that, if we asked the employer at the moment of the decision what its reasons were and if we received a truthful response, one of those reasons would be that the applicant or employee was a woman." *Id.* at 250, 109 S.Ct. 1775.[13] Once a plaintiff has shown that the illegal criteria was a motivating or substantial factor, "the factfinder is entitled to presume that the employer's discriminatory animus made a difference to the outcome, absent proof to the contrary by the employer." *Id.* at 276, 109 S.Ct. 1775 (O'Connor, J., concurring). Finally, because the injury under this standard is that the employer relied on an impermissible factor in making the decision, there is no doubt that such reliance would be fairly traceable to the actions of the employer and that a favorable decision by the court could redress the injury.[14]

### 2. The "Same Decision" Defense and *Texas v. Lesage*

■ Under this latter standard, "[w]hen the plaintiff successfully shows that an unlawful motive was a substantial factor in the employer's action, the defendant may seek to prove in response that it would have taken the contested action even absent the discriminatory motive." *Thomas,* 131 F.3d at 202–03. The reason why the employer may attempt to make this showing is that "under *Price Waterhouse* a defendant who is guilty of acting pursuant to an unlawful motive may nonetheless escape liability by proving that it would have made the same decision in the

---

**12.** For purposes of this issue only, it does not matter that these cases involved suits brought under Title VII.

**13.** In her concurring opinion in *Price Waterhouse,* Justice O'Connor argued that the plaintiff should have to show that "an illegitimate criterion was a 'substantial factor' in the employment decision[.]" *Price Waterhouse,* 490 U.S. at 274–77, 109 S.Ct. 1775 (O'Connor, J., concurring). To the extent there may a substantive difference between finding something to be a "motivating" factor versus a "substantial" factor, but see Justice Brennan's opinion in *Price Waterhouse,* that difference would go to the merits of a plaintiff's claim rather than to her standing to bring the action. Therefore, whatever difference there may be between the two standards, it is not relevant to the instant matter at this time.

**14.** It is worth noting that this "injury" is different than the injury suffered when a plaintiff is forced to compete on unequal footing. To be sure, in *Wooden,* one of the plaintiffs was treated different than minority applicants at one stage of the admissions process. That plaintiff was subsequently rejected at a later stage of the process that was race neutral. Under those circumstances, the plaintiff had suffered an injury for purposes of the equal footing standard because he had been subject to unequal treatment. He did not, however, suffer an injury under the motivating factor standard because although race was a factor at one point of the process, the actual decision to reject his application was based on race neutral criteria. In other words, race was not a motivating factor in the actual decision to reject his application.

absence of the unlawful motivation." *Id.; Doll*, 75 F.3d at 1202 (noting that "[i]f the plaintiff proves that the employer was motivated to take the action of which the plaintiff complains, which might be, as here, the denial of a promotion, by a discriminatory purpose, but the employer proves that he would have taken the same action even if he had had no discriminatory purpose, the employer has negated liability and not just injury.").[15] Courts have referred to this showing by the employer as the same decision defense. In order to satisfy this burden, the employer "must show that its legitimate reason, standing alone, would have induced it to make the same decision." *Price Waterhouse*, 490 U.S. at 252, 109 S.Ct. 1775. "As to the employer's proof, in most cases, the employer should be able to present some objective evidence as to its probable decision in the absence of an impermissible motive." *Id.* *See also Hopkins v. Price Waterhouse*, 920 F.2d 967, 972–74. Merely showing that the employer *could* have made the same decision is not the same as proving that it *would* have made the same decision, and such a demonstration is therefore insufficient. *Id.* See also *Speedy v. Rexnord Corp.*, 243 F.3d 397, 402 (7th Cir.2001) ("proving that the same decision would have been justified absent an [illegal] motive is not the same as proving the same decision would have been made absent the motive."). If the employer is unable to show that it would have made the same decision absent the illegal factor, then the factfinder is justified, as noted above, in concluding that the decision was made because of consideration of the ille-

gal factor. *Price Waterhouse*, 490 U.S. at 252, 109 S.Ct. 1775.

One recent (and controversial) application of the same decision defense occurred in *Texas v. Lesage*, 528 U.S. 18, 120 S.Ct. 467, 145 L.Ed.2d 347 (1999). *Lesage* involved the claim of a white applicant, Francois Daniel Lesage, who alleged that he had been denied admission to a school's Ph.D. program in counseling psychology on account of his race. The school admitted to considering race in the selection process, but argued—in its motion for summary judgment—that Lesage's qualifications were such that he would have been denied admission even if the selection process were colorblind. The school initially noted that in the year Lesage applied, it received 223 applications for the program and offered admission to approximately 20 candidates. The school submitted evidence that "[a]t least 80 applicants had higher undergraduate grade point averages (GPA's) than Lesage, 152 applicants had higher Graduate Record Examination (GRE) scores, and 73 applicants had both higher GPA's and higher GRE scores." *Id.* at 19, 120 S.Ct. 467. The school also filed an affidavit of Professor Ricardo Ainslie, one of two faculty members on the school's admissions committee. In his affidavit, Professor Ainslie stated that in addition to having a lower GPA and GRE score than several other applicants, Lesage also had "weak" letters of recommendation and his personal statement indicated that he only had a "superficial interest" in the field. *Id.* Based on these factors, Professor Ainslie stated that Lesage's application was rejected early in the review process, when the committee was winnowing the

---

**15.** It is worth noting that Congress amended Title VII (in 1991) to provide that once a plaintiff proves that an illegal factor was a motivating or substantial factor in the decision, liability is established. Thereafter, the employer cannot avoid liability, but it can preclude the court from awarding certain remedies such as compensatory damages or reinstatement if it is able to prove that it would have made the same decision absent the illegal factor. *Borgo v. Goldin*, 204 F.3d 251 (D.C.Cir.2000); *Pilditch v. Chicago*, 3 F.3d 1113 (7th Cir.1993).

full application pool to a list of 40. *Id.* Based on this evidence, the District Court concluded that race did not effect the decision to reject Lesage and that there was uncontested evidence that the students ultimately admitted to the program had credentials that the committee considered superior to the plaintiff's. It therefore granted the university's motion for summary judgment and dismissed the case.

Although the Fifth Circuit recognized the district court's findings as undisputed, it nevertheless concluded that they were irrelevant to the question before the court, namely, "whether the state violated Lesage's constitutional rights by rejecting his application in the course of operating a racially discriminatory admissions program."[16] *Lesage v. Texas,* 158 F.3d 213, 222 (5th Cir.1998). In reversing the district court, the Fifth Circuit found that summary judgment could not be granted in favor of the school because there remained a factual dispute as to whether the stage of review during which it rejected Lesage's application was in some way race conscious. *Id.* The Fifth Circuit additionally found that the possibility that Lesage "would not have been offered admission [wa]s relevant only to the quantum of damages available—not the pure question of the state's liability, which [wa]s the issue on summary judgment." *Id.* at 222.

On appeal, the Supreme Court reversed. The Court held that "where there is no allegation of an ongoing or imminent constitutional violation to support a claim for forward-looking relief, the government's conclusive demonstration that it would have made the same decision absent the discrimination precludes any finding of liability." *Lesage,* 528 U.S. at 21, 120 S.Ct. 467. In making this determination, the Court found that "[i]nsofar as the Court of Appeals held that summary judgment was inappropriate on Lesage's 1983 action seeking damages for the school's rejection of his application for the 1996–1997 academic year even if [the school] conclusively established that Lesage would have been rejected under a race neutral policy, its decision is inconsistent with this Court's well-established framework for analyzing such claims." *Id.* at 20, 120 S.Ct. 467. Specifically, the Court cited its decision in *Mt. Healthy City Board of Education v. Doyle* as providing the appropriate framework to apply in this type of case. *Id.*[17] The Court observed that under *Mt. Healthy,* "even if the government has considered an impermissible criterion in making a decision adverse to the plaintiff, it can nonetheless defeat liability by demonstrating that it would have made the same decision absent the forbidden consideration." *Id.; See also Mt. Healthy,* 429 U.S. at 287, 97 S.Ct. 568 (finding that initially, "the burden was properly placed upon [the plaintiff] to show that his conduct was constitutionally protected, and that this conduct was a 'substantial factor' or to put it in other words, that it was a 'motivating factor' in the Board's decision not to rehire him. [Plaintiff] having carried that burden, however, the District

---

**16.** The court considered the "injury in cases of this kind [to be that] a discriminatory classification prevent[s] the plaintiff from competing on an equal footing." *Lesage,* 158 F.3d at 222.

**17.** It is important to note that *Mt. Healthy* was one of the cases cited by the Supreme Court in *Price Waterhouse.* In fact, there does not appear to be any substantive difference between the standard applied by the Court in *Mt. Healthy* and the standard applied by the Court in *Price Waterhouse.* In both cases, the burden was initially placed on the plaintiff to demonstrate that an illegal or impermissible factor was a motivating or substantial factor in the employment decision. Once the plaintiff made that showing, however, the employer could nevertheless defeat liability by showing that it would have made the same decision even without the illegal factor.

Court should have gone on to determine whether the Board had shown by a preponderance of the evidence that it would have reached the same decision as to [the plaintiff's] reemployment even in the absence of the protected conduct."). Thus, the Court opined that "where a plaintiff challenges a discrete government decision as being based on an impermissible criterion and it is undisputed that the government would have made the same decision regardless, there is no cognizable injury warranting relief under § 1983." *Id.* Accordingly, the Court held that the university's motion for summary judgment should have been granted and the case dismissed.

As a result of the Supreme Court's decision in *Lesage*, some courts have found that the same decision defense can—in addition to defeating a plaintiff's claim for compensatory damages—be used by an employer to demonstrate that a plaintiff lacks standing to bring a lawsuit in the first place. *Yeager*, 265 F.3d at 395–97; *Boston's Children First v. Boston School Committee*, 183 F.Supp.2d 382 (D.Mass. 2002); *Comfort v. Lynn School Committee*, 150 F.Supp.2d at 300. In particular, these courts have stated that once an employer

demonstrates that the same decision would have been made absent the illegal factor, the employer has proven that the plaintiff has not suffered an injury in fact and, therefore, that the plaintiff lacks standing.[18] For example, in *Yeager* (which is discussed above), the Sixth Circuit held that the plaintiff lacked standing because General Motors demonstrated that he would not have been admitted into the apprentice program even under race and gender neutral criteria. *Yeager*, 265 F.3d at 395–97. While the court did not expressly rely on *Lesage*, it nonetheless found that the plaintiff was not injured within the meaning of Article III because the defendant would have taken the same action regardless of the plaintiff's race and gender. Moreover, the court in *Boston's Children First v. Boston School Committee* specifically interpreted *Lesage* as holding that "[i]f the result would have been the same, regardless of the plaintiff's race, he or she cannot be said to have suffered an injury attributable to the defendants' unconstitutional conduct. The plaintiff, in other words, would lack standing." *Boston's Children First*, at 392.

On the other hand, some courts [19] have

---

**18.** In *Yeager*, the district court found that the same decision defense "eliminates any causal connection between the affirmative action system Plaintiff is challenging and his injury in failing to enter the apprentice program." 67 F.Supp.2d 796, 800–01 (N.D.Ohio 1999). The court concluded that the plaintiff "has [thus] failed to demonstrate the second and third elements of standing, i.e. causation and redress, as he would not have been given an apprenticeship even in the absence of an affirmative action program." *Id.* While the district court's formulation in this case is somewhat different than the approach taken by other courts, its conclusion is nonetheless entirely consistent with the other decisions. The district court in *Yeager* simply assumed that the injury requirement was satisfied because the plaintiff did not gain admittance into the apprenticeship program. It found, however, that the plaintiff's failure to obtain

that benefit was not "caused" by the affirmative action policy and therefore, the court could not redress the injury. In contrast, other courts have proceeded under the assumption that "the very notion of injury implies a causal connection to the challenged activity[.]" Wright, Miller, and Cooper *Federal Practice and Procedure* 418 (1984). Thus, when an employer demonstrates that the same decision would have been made absent the discriminatory factor, it actually demonstrates that the plaintiff has not suffered any injury because they would be in precisely the same position either way. For purposes of Saunder's case, this is a distinction without difference. For the sake of simplicity and consistency, however, the Court will proceed under the approach taken by the other courts.

**19.** Commentators have also questioned the applicability of the same decision defense to

explicitly found that the same decision defense, while dispositive in the context of liability, is not even probative on the plaintiff's standing to bring a discrimination claim. *Wooden*, 247 F.3d at 1279–82; *Farmer v. Ramsay*, 159 F.Supp.2d 873, 886 (D.Md. 2001).[20] In *Wooden*, as discussed above, the Eleventh Circuit held that a plaintiff who was denied admission to the University of Georgia under race neutral criteria had standing to challenge the policy because his application was treated differently at an earlier stage in the admissions process. *Wooden*, 247 F.3d at 1279–82. In reaching this conclusion, the Court found that:

> "A showing that Green was denied admission under race-neutral criteria, and that his application would have been handled in exactly the same way even if race were not a factor at the TSI stage, may well defeat Green's claim or establish a *Mt. Healthy* defense. But at least in this context the Supreme Court has chosen to define the relevant injury-in-fact without regard to the end result of the defendant's consideration of race ... Especially in this area, we cannot read the Court's jurisprudence as conflating the standing inquiry with resolution of the merits of the plaintiff's attack on race-conscious governmental decision-making. Defendant's argument that Green suffered no injury-in-fact is unconvincing because, at bottom, it conceives of the standing inquiry as duplicating an inquiry into the merits."

*Wooden*, 247 F.3d at 1280; *Alexander v. Estepp*, 95 F.3d 312, 315 n. 5 (4th Cir.1996) ("The district court held as a preliminary matter that all the plaintiffs had standing, including those who would not have been hired even in the absence of the department's affirmative action program. We affirm this ruling [since their injury was that they were unable to compete on an equal footing, rather than that they would have obtained the benefit but for the discriminatory policy]."). In *Farmer*, the court agreed with the Eleventh Circuit's classification of the "'same decision' argument as a complete defense on the merits rather than a challenge to standing." *Farmer*, 159 F.Supp.2d at 886.

### 3. Causation and Redressability Requirements

Because the manner in which the injury is defined in these cases is so significant, the Court will only briefly discuss the other two requirements of the standing doctrine. First, in order to have standing to initiate a lawsuit, the plaintiff must be able to show that his alleged injury is fairly traceable to the defendant's unlawful conduct. *Lujan*, 504 U.S. at 560–61, 112 S.Ct. 2130. To satisfy this causation requirement, there must be a sufficiently clear causal connection between the illegal action taken by the defendant and the injury suffered by the plaintiff. *California Assoc. of Physically Handicapped v. FCC*, 778 F.2d 823, 825–26 (D.C.Cir.1985).

the standing inquiry. *See e.g.,* Sheldon Nahmod, *Mt. Healthy and Causation–In–Fact: The Court Still Doesn't Get It!*, 51 Mercer L.Rev. 603 (2000) (concluding that *Mt. Healthy* and *Lesage* are "disguised damages cases.").

**20.** It is important to note that the courts that have reached this conclusion assume that the injury is unequal treatment rather than denial of the actual benefit. This may explain why these courts concluded that the same decision

defense is not relevant for purposes of standing. At the same time, however, it is important to note that these courts have recognized the same decision defense as a method of defeating liability. *See, e.g, Wooden*, 247 F.3d at 1280–82 ("This is not to say that Green must, or should, prevail on his cause of action. Defendants may well be correct that Green would not have been admitted to UGA even if race were not a factor, and may eventually defeat Green's claim on that basis or on other grounds.").

Moreover, to satisfy the redressability prong, the plaintiff must show that it is likely, as opposed to merely speculative, that his injury will be redressed by a favorable decision. *Lujan,* 504 U.S. at 560, 112 S.Ct. 2130.

### 4. The Instant Case

█ In determining whether a plaintiff has standing, the foregoing discussion illustrates that courts have applied two distinct standards in cases where the plaintiff challenging an allegedly discriminatory government policy seeks retrospective relief. In particular, some courts find that the "injury" in these cases is that the plaintiff was not able to compete for the benefit on an equal footing with other candidates. These courts hold that the critical inquiry is whether the plaintiff was *personally* subject to different treatment. If the answer is yes, and the plaintiff further demonstrates that the unequal treatment was because of the government or its policy and that the court could redress his injury, then the plaintiff has standing to bring the claim. On the other hand, some courts find that the injury in these cases is the actual denial of the benefit. These courts find that the plaintiff must allege that an illegal factor was a motivating or substantial factor in the ultimate decision to deny him the benefit. The plaintiff also must show that the illegal factor was used because of the employer or its policy and that the court could redress the injury. After the plaintiff makes that showing, however, the defendant *may* be able to divest the plaintiff of standing by showing that the same decision would have been made even absent the discriminatory factor.

The Court finds that it does not need to determine at this time which standard is correct because it concludes that Saunders has standing to challenge the Army's promotion policy under both of them. In his amended complaint, Saunders alleges that the Army's equal opportunity policy—which was used twice in determining whether he would be promoted to the rank of colonel—favors minority and female officers in the promotion process. Specifically, he claims that the "instructions, both as set forth in writing and as actually interpreted and executed by" the 1996 and 1997 boards "denied Plaintiff his equal protection rights, guaranteed by the Fifth Amendment to the United States Constitution." Amended Complaint at ¶ 20. Saunders contends that the Army's promotion policy created racial and gender classifications that resulted in preferential treatment towards minority and female candidates during the initial phases of the process *and* during the review and revote stage. Thus, Saunders claims that he was unable to compete with minority and female candidates on an equal footing in the promotion process and that race and gender were motivating factors in the decision whether to promote him. Assuming that these factual allegations are true, which the Court must do for purposes of a motion to dismiss, Saunders clearly would satisfy the threshold showing of injury in fact. Moreover, the Court finds below that the equal opportunity instructions provided to the 1996 and 1997 selection boards *did* contain racial and gender classifications. Thus, at this point in the litigation, Saunders may very well have sustained his ultimate burden of showing that race and gender were motivating factors in the decision not to promote him or that the factors prevented him from competing with minority and female candidates on an equal footing. In addition, there is no doubt that the introduction of race and gender into the selection process-both in the initial phases and during the review and revote stage-can be fairly traced to the equal opportunity instruction that the Army gave to the boards. Finally, Saunders seeks compensatory damages and to

have his personnel file corrected. Both of these forms of relief would redress his injury in this case.

As discussed above, however, some courts have held that despite making this showing, the government can still divest the plaintiff of standing by proving that the plaintiff would not have received the benefit even absent the illegal factor.[21] The Army contends that this is such a case (like *Lesage*) and that Saunders would not have been promoted to the rank of colonel even under gender and race neutral crite-

ria. The Court finds that, even assuming *arguendo* that the same decision defense goes to standing, the instant case is readily distinguishable from *Lesage* (and its progeny) because the defendant has failed to demonstrate that both the 1996 and 1997 selection boards would have reached the same conclusion regarding the promotion of the plaintiff without the army's equal opportunity instruction. First, it is worth noting that the selection boards' records might have resolved this question, but the Army, in accordance with standard operat-

**21.** There appears to be several problems with this approach. First, the Supreme Court did not address (or even mention) the same decision defense in the context of standing or jurisdiction in *Lesage*. Rather, the Court ruled that the defendant was entitled to summary judgment since it had established-after discovery had taken place-that it would have made the same decision under race and gender neutral criteria. Given this procedural posture, it seems unlikely that the Court intended the portions of its *per curiam* opinion that refers to "defeat[ing] liability" and "cognizable injury" as meaning Lesage lacked standing to assert his claim in the first instance. This conclusion is reinforced by the Supreme Court's characterization of the same decision defense in earlier cases. *See e.g.*, *Mt. Healthy*, 429 U.S. at 285–87, 97 S.Ct. 568; *Price Waterhouse*, 490 U.S. at 246, 109 S.Ct. 1775 (Brennan, J.) and 274 (O'Connor, J., concurring). Second, applying the same decision defense as a mechanism by which the defendant can divest the plaintiff of standing unnecessarily conflates the standing inquiry with the actual merits of the plaintiff's claim. While there may be some overlap between the two, the "standing doctrine was not intended to provide a vehicle for resolution at the threshold of fundamentally merit issues." *Wooden*, 247 F.3d at 1280. Indeed, the Supreme Court has repeatedly admonished courts not to consider the merits of a plaintiff's claim in determining whether he has standing to bring the action. *Warth*, 422 U.S. at 500, 95 S.Ct. 2197 (recognizing that "standing in no way depends on the merits of the plaintiff's contention that particular conduct is illegal"); *Whitmore*, 495 U.S. at 155, 110 S.Ct. 1717 (stating that "we thus put aside for now Whitmore's Eighth Amendment

challenge and consider whether he has established the existence of a 'case or controversy.' "). Moreover, conflating these two issues becomes particularly troublesome in the context of employment discrimination cases since the ultimate issue in these actions is almost always whether an employment decision was made because of an illegal factor (such as race, gender, age, or religion) and usually subjective criteria is used in making that determination. Third, using the same decision defense to purge a plaintiff of standing is seemingly at odds with cases that hold that a person may recover damages for emotional distress caused by his having been denied due process of law, even though if he had received due process he would still have lost the cause in which the procedural violation occurred. *Carey v. Piphus*, 435 U.S. 247, 263–64, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978); *Price v. City of Charlotte*, 93 F.3d 1241, 1245–48 (4th Cir.1996). As the Seventh Circuit stated in *McNamara v. City of Chicago*, 138 F.3d 1219 (7th Cir.1998), "so it can be argued that a person denied a benefit on an invidious ground may obtain damages for emotional distress caused by that denial even if he would have been denied the benefit anyway." *McNamara*, 138 F.3d at 1221–22. *But see Erwin v. City of Chicago*, 1998 WL 704295 (N.D.Ill. September 30, 1998). While this Court does not need to "wrestle the issue to the ground,".it is worth noting this apparent inconsistency. *Id.* Of course, the Supreme Court could simply hold that a different rule applies in the two types of cases. Before a lower court such as this one reaches that conclusion, however, a more definitive statement on the issue appears necessary than provided in *Lesage*.

ing procedure, had them destroyed shortly after the boards made their decisions.

Second, the defendant has failed to provide any evidence that the 1996 Board, using race and gender neutral criteria, would still not have recommended Saunders for promotion to the rank of colonel. Rather, the defendant merely argues that the outcome would have been the same since the 1996 Board did not conduct a revote; that is, decide to replace a white male that was tentatively recommended for promotion with a minority or female candidate that tentatively was not selected for promotion. The problem with the Army's position is that even the initial phases of the equal opportunity instruction are being challenged as unconstitutional under the 5th Amendment.[22] In other words, according to the plaintiff, the 1996 Board utilized impermissible criteria, namely race and gender, when it was determining who should tentatively be selected for promotion. Further, the defendant's own evidence indicates that out of the sixteen individuals that the 1996 Board recommended for promotion, two were black males and two were white females. This evidence establishes that the criteria found in the equal opportunity instruction could have been a factor that prevented the plaintiff from being promoted to the rank of colonel.[23] Thus, for purposes of this lawsuit, it makes no difference that the 1996 Board did not ultimately conduct a revote.

Third, the defendant has failed to show that the 1997 Board would not have recommended Saunders for promotion if it had used a race and gender neutral standard while evaluating potential promotees. As noted above, the plaintiff alleges that even the initial phases of the recommendation process violated the 5th Amendment. In particular, Saunders claims that in addition to having a selection goal for minority and female officers, the 1997 Board was explicitly instructed to review the plaintiff's credentials without looking for signs of past discrimination while it was instructed to "be alert to the possibility of past personal or institutional discrimination" when evaluating the records of minority and female officers. Moreover, the evidence presented by the defendant shows that out of the sixteen officers recommended for promotion, two were black males, two were white females, and one was an Asian/Pacific Islander male. This evidence establishes that, for a second time, the criteria found in the equal opportunity instruction could have been a factor that prevented the plaintiff from being promoted to the rank of colonel.

Furthermore, unlike the 1996 Board, the 1997 Board, after concluding that it did not meet its selection goal for women, did review the record of those female candidates that, though fully qualified for selection, had nevertheless not been recommended for promotion. As a result of this review and the subsequent revote, the 1997 Board

---

22. Specifically, the plaintiff argues that it was unconstitutional for the Army to instruct the 1996 Board to review the plaintiff's credentials without looking for signs of past discrimination, while it instructed the Board to "be alert to the possibility of past personal or institutional discrimination" when evaluating the records of minority and female officers. The plaintiff also challenges the fact that the 1996 Board had been "given an equal opportunity selection goal" by the army at the outset of the review process.

23. The Court recognizes that the plaintiff's challenges in this regard do not necessarily mean-or even suggest for that matter-that, under a race and gender neutral approach, Saunders would have been recommended by the 1996 Board for promotion instead of one of these four individuals. The evidence is important, however, because if there were not any minority or female officers in the group of potential promotees, then it would be clear that the plaintiff would not have been promoted even if the 1996 Board utilized a colorblind and gender neutral criteria.

upgraded a female officer's status to selectee, and downgraded another officer's status to non-selectee. Thus, the 1997 Board clearly denied a place on the recommendation list to a male officer as a result of the equal opportunity instruction. Additionally, it is worth noting that the Army's own evidence indicates that the plaintiff was ranked higher than at least 80 of the 103 individuals the 1997 Board considered for promotion.[24] Def.'s Supplemental Memo. In Support of Motion to Dismiss at 9–10. This finding directly refutes the defendant's contention that Saunders' case is comparable to the action instituted by Lesage. *Lesage*, 528 U.S. at 21, 120 S.Ct. 467. *See also Yeager*, 265 F.3d at 395–97.

In short, the Army has failed to present evidence that demonstrates that Saunders would not have been recommended for promotion even if the selection boards utilized race and gender neutral criteria. The mere fact that Saunders was one of several individuals who was denied a promotion does not by itself satisfy the defendant's burden. In all of the cases where the court found that the plaintiff lacked standing because the government would have made the same decision anyway, the defendant had demonstrated that the plaintiff in particular would not have received the benefit. In this case, the Army's evidence that numerous individuals were vying for a limited number of slots does not show that Raymond Saunders would have been rejected. Despite this conclusion, however, it is important to note that, after discovery is complete, the government can still move for summary judgment based on the same decision defense. The Court expresses no opinion at this time on the merits of such a motion.

In finding that Saunders has standing to assert these claims, the Court has also been mindful of the overarching principles underlying the doctrine of standing. Such principles include, first and foremost, the separation of powers doctrine implicit in Article III's case or controversy requirement. This doctrine warns against accepting cases where plaintiffs are seeking to "convert the judicial process" for goals they were unable to obtain from the other branches. *See, e.g., Haitian Refugee Center v. Gracey*, 809 F.2d 794, 800–07 (D.C.Cir.1987) (Bork., J., for the majority) (arguing that standing analysis should always be "informed by separation of powers concerns"). Another principle is the desire to have plaintiffs with a significant personal stake in the outcome. Such a stake, argues the judiciary, will assure the court of " 'that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions.' " *Flast v. Cohen*, 392 U.S. 83, 99, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968) (quoting *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962)); *Warth*, 422 U.S. at 499 (noting that "[t]he Article III judicial power exists only to redress or otherwise to protect against injury to the complaining party, even though the court's judgment may benefit others collaterally. A federal court's jurisdiction therefore can

---

**24.** According to the defendant, the relative standing list that the board prepares is destroyed within 30 days of the adjournment of the board. Comparison files are retained, however, for use if a special selection board is convened. These files normally consist of the files of 14 candidates: the seven with the lowest rankings whom the board recommended for promotion and the seven with the highest rankings whom the board did not recommend for promotion. The comparison files do not contain the rankings of the 14 candidates relative to each other. Def.'s Supp Mem. at 4. Raymond Saunders' file was retained as one of the board's comparison files after the 1997 Board made its recommendations. Miller Decl. 8/7/01 ¶ 6. Thus, the Army concedes that he was one of seven individuals that could have been displaced by the revote.

be invoked only when the plaintiff himself has suffered 'some threatened or actual injury resulting from the putatively illegal action[.]' "). A final principle, which is somewhat a derivative of the first two,[25] is that individuals do not have standing to assert generalized grievances. Under this principle, plaintiffs with nothing more than a "generalized interest," that is, an interest which is " 'undifferentiated' from that of all other citizens," are not possessed of a concrete enough injury to have standing. *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 217, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974) (citing *United States v. SCRAP*, 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973)).

Keeping these principles in mind, as well as the precedent discussed above, the Court is satisfied that the plaintiff has standing to seek retrospective relief. First, the Court sees nothing in the principles undergirding the standing doctrine that suggests that the Court should not exercise jurisdiction. Although affirmative action is, of course, a very charged political issue and has been repeatedly addressed by the legislative and executive branches, the issue is not solely a political one. To the contrary, the issue implicates core constitutional rights which the judiciary has long found within its purview to review. *See, e.g., Adarand Constructors*, 515 U.S. at 227, 115 S.Ct. 2097. Therefore, there is little concern that the plaintiff is attempting to "convert the judicial process" for his own policy objectives. Nor is there any concern in this case that the plaintiff is positioned in a way that he will fail to present the Court with the "concrete adverseness" necessary for an "illuminated" adjudication. As a white male who has been denied a promotion, he is perfectly situated to challenge the promotion policies that treated the females and minority candidates that he was competing against differently than him. The Court's conclusion that Saunders has standing is thus entirely consistent with the cases that hold that only those persons who are personally denied equal treatment have standing to challenge an allegedly discriminatory governmental policy. *See e.g., United States v. Hays*, 515 U.S. 737, 744, 115 S.Ct. 2431, 132 L.Ed.2d 635 (1995) (noting that "even if a governmental actor is discriminating on the basis of race, the resulting injury accords a basis for standing only to those persons who are personally denied equal treatment by the challenged discriminatory conduct."); *Allen v. Wright*, 468 U.S. 737, 755, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984) (same). Finally, this case does not arise from a "generalized grievance"; to the contrary, it is a very specific grievance that only applies to a small population of military officers.

### 5. Mootness

■ Alternatively, the defendant argues that the convening of a Special Selection Board ("SSB")[26] makes the instant

---

**25.** In *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 94 S.Ct. 2925, 41 L.Ed.2d 706(1974), the Supreme Court described this principle as flowing from the separation of powers principle and personal stake principle, discussed above. *Id.* at 221, 94 S.Ct. 2925 Although this principle could thus be characterized as a subordinate matter, the notion that generalized grievances do not give rise to standing is sufficiently extant in its own right to merit its observance as an key aspect of standing doctrine.

**26.** Special selection boards are convened if the Secretary finds that a selection board engaged in "material unfairness" in rejecting a particular candidate. The special selection board evaluates the record of the person whose name was referred to it for consideration along with the records of a sampling of the officers whom the selection board accepted and rejected. The comparison files, which were described above, provide the "sampling" of records that the board considers. These records are presented randomly to the board. In addition, the board is not supposed

case moot because it provided the plaintiff with all the relief he was seeking. The Court disagrees. First, it is worth noting that this is the second time that the defendant has presented this argument. In its March 19, 2001 Memorandum Opinion, the Court explicitly rejected the defendant's contention in this regard. The Court sees no reason to disturb that conclusion.

Second, the convening of a SSB, which reconsidered the plaintiff's application using a changed affirmative action policy and subsequently re-denied him a promotion, says nothing about what decision the original selection board would have made. That is, the fact that a different board using different criteria failed to recommend Saunders for promotion does not demonstrate that the original selection board, using race and gender neutral criteria, would have failed to recommend Saunders for promotion. As noted above, the defendant has not presented any evidence that demonstrates that the original boards would have reached the same conclusion using a race and gender neutral standard. Thus, at the outset, it is important to understand that convening a SSB could only be applicable in the context of determining the appropriate relief in this case, it would not defeat (or even affect) liability.[27]

Third, the Court is troubled by the plaintiff's allegation that the President of the SSB which reconsidered the plaintiff

for promotion was "well acquainted with the instant litigation and . . . has personally given speeches and presentations to other Army JAG officers throughout the world, opining therein that the Plaintiff's case is a frivolous attack on the institution of the Army and the JAG Corps." The plaintiff further alleges that "[g]iven this General Officer's bias, knowledge of, and personal involvement in this current litigation-even prior to his presiding over Plaintiff's [SSB]-the results of that [SSB] were nothing more than a cruel sham[.]" While the Court will not simply accept the plaintiff's allegations as true, this issue would have to be explored further before the Court could rule as a matter of law that it lacks jurisdiction because of mootness. *Horn v. United States*, 230 Ct.Cl. 18, 671 F.2d 1328, 1331 (1982) (noting that "[w]here, as here, the defect goes to board composition, rather than to the contents of an officers OERs or files . . ., automatic voiding of the passover is justified.").

Finally, even if the Court accepted the defendant's contention that a SSB would make the plaintiff's claims moot, the defendant did not convene a SSB to reconsider the decision of the 1996 Board. Thus, Saunders' claims with respect to the 1996 Board's decision are clearly not moot. *Porter v. United States*, 163 F.3d 1304, 1307 (Fed.Cir.1998) ("The Air Board thus recommended to the Secretary of the Air Force that the OER be voided and that

---

to know which candidate is the one for whom the board was convened.

27. In this regard, the Court's decision is consistent with the recent ruling by Judge Smith in *Christian v. United States*, 49 Fed. Cl. 720 (Fed.Cl.2001). In that case (which is discussed more fully below), the court held that the Army, after liability had already been established, could not use the conclusions of reconstituted review boards to show that the initial review boards would have made the same decisions absent the illegal factors. In particular, Judge Smith wrote that "[t]he

'harmless error' rule of *Lesage* concerned proof of facts as they were at the time of the alleged violation and injury, not creation of new procedures and analysis of new outcomes. Tellingly, the government is not offering to produce affidavits or records documenting the journeys of individual personnel files through secret SERB [Selective Early Retirement Board] proceedings held all the way back in 1992; nor can it do so. The reconstituted board procedure cannot produce any, much less conclusive evidence of the 1992 SERB's decision-making." *Christian*, 49 Fed. Cl. at 724–25.

*two* SSBs (for each of the CY84B and CY85A captain promotion boards) convene to reconsider Porter for promotion.") (emphasis added). In addition, it appears that the SSB that reconsidered the 1997 Board's decision knew of Saunders' failure to be promoted in 1996. Thus, the failure to convene a SSB to reconsider the decision of the 1996 Board is also important because it affects the validity of the SSB that reconsidered the 1997 Board's decision. *Id.* In other words, the SSB that reconsidered the 1997 Board's decision is likely not an adequate remedy because it knew of Saunder's illegal non-selection by the 1996 Board.

Before considering the constitutionality of the Army's promotion policy, a brief discussion about cases such as *Dilley v. Alexander*, 603 F.2d 914 (D.C.Cir.1979), and *Doyle v. United States*, 220 Ct.Cl. 285, 599 F.2d 984 (1979), is warranted. In these cases (and their progeny), the courts found that where the composition of the board itself was illegal, the *Mt. Healthy* framework did not apply and consequently the Army could not avoid liability by showing that the board would have made the same decision anyway. *Dilley*, 603 F.2d at 921–23; *Doyle*, 599 F.2d at 994–96. In *Dilley*, the court explained the basis for its conclusion as follows:

> The Mount Healthy Court was concerned solely with whether the school board had acted beyond the scope of its discretion. The school board had no power to act on constitutionally impermissible considerations, and the Supreme Court's 'but for' test, if it may be deemed such, was fashioned only to resolve the factual issue of whether the school board had so acted. There was no procedural violation, statutory or otherwise, leading to the school board's action. . . . Here, appellants do not attack the substantive basis for the Army's decision. Their challenge is instead based on a violation of conceded procedural

rights contained in the statute governing the military's promotion system. . . . [T]his case simply does not involve the permissible exercise of discretion, and herein lies the principal error in the Army's analysis.

*Dilley*, 603 F.2d at 922; *Doyle*, 599 F.2d at 995 (noting that "[t]he error in this case, however, is not a violation of the plaintiffs' substantive rights but rather a violation of the plaintiffs' rights to a fair procedure or process."). In these cases, the composition of the boards was illegal because they did not contain reserve officers. The courts determined that as a result of this compositional defect, it was impossible to remove the taint of illegality by showing that the same decision would have been made because no set of circumstances could make those particular boards' determinations valid. *Id.* In fact, in these cases there was no indication that the boards considered an illegal or impermissible factor in making the decision. The principal issue was therefore not whether the boards exercised or would have exercised their discretion properly (since illegally constituted boards have *no* discretion or power to act in the first place), but rather whether the boards were in fact legally or illegally constituted. Accordingly, once the courts found the composition of the boards to be illegal, they had no trouble finding that the boards' decisions regarding the plaintiffs had to be reversed. *Id.See also Whitus v. Georgia*, 385 U.S. 545, 87 S.Ct. 643, 17 L.Ed.2d 599 (noting that a criminal conviction will be reversed if minorities were prevented from serving on the jury).

In contrast, the Supreme Court has made it clear that when the illegality concerns the basis for (or the factors used in making) the defendant's decision, the *Mt. Healthy* framework is the controlling standard. *Lesage*, 528 U.S. at 20–21, 120 S.Ct. 467; *Price Waterhouse*, 490 U.S. at 246–50, 109 S.Ct. 1775. In these cases, there is no doubt that the defendant has the discre-

tion and power to deny the plaintiff admission to a university program or to deny her a promotion. The relevant issue, rather, is whether the defendant would have exercised that discretion in the same manner without relying on any illegal factors. If the defendant can prove that it would have made the same decision irrespective of the illegal factors, then it has, for purposes of liability, exercised its discretion in a legal manner. As the Supreme Court noted in *Lesage*, "even if the government has considered an impermissible criterion in making a decision adverse to the plaintiff, it can nonetheless defeat liability by demonstrating that it would have made the same decision absent the forbidden consideration." *Lesage*, 528 U.S. at 20–21, 120 S.Ct. 467.

At least as far as liability is concerned, Saunders' case is more analogous to *Lesage* and *Price Waterhouse* than to *Dilley* and *Doyle*.[28] In the instant action, the Court emphatically rejected Saunders' facial claims concerning the composition of the selection boards that failed to choose him for promotion. The Court determined that these boards were properly constituted and, as such, Saunders' challenge now exclusively concerns the manner in which these selection boards exercised their discretionary power to pick individuals for promotion.[29] This is precisely the same posture that *Lesage* and *Price Waterhouse*

---

28. While this conclusion is seemingly at odds with Judge Smith's recent ruling in *Christian*, upon close inspection it is not. As noted above, in that case the Army did not assert the same decision defense until after liability had already been established. Moreover, when the Army finally did assert the defense, it did not present any evidence concerning the decisions of the original review boards. Rather, the Army was trying to use the reconstituted boards to show how the original review boards would have decided the issue. In the instant case, the Court agrees with Judge Smith's conclusion that SSBs cannot be used to demonstrate that the original selection boards would have denied the plaintiff a promotion irrespective of illegal factors. This Court will rule on the significance of SSBs (in the remedies phase), however, only after liability has been established.

29. In this regard, it is also worth noting that this case is similar to yet distinguishable from another line of military back pay cases decided by the Court of Claims (now the Federal Court of Claims). In these cases, individuals were involuntarily separated from the military after having been passed over twice for promotion. As the Court of Claims stated in *Doyle*:

[t]he holding in *Mt. Healthy*, applying the 'harmless error' test to substantive constitutional rights, is analogous to our recent decisions in the military pay area in *Sanders v. United States*, 219 Ct.Cl. 285, 594 F.2d

804 (1979), and *Skinner v. United States*, 219 Ct.Cl. 322, 594 F.2d 824 (1979). In those cases, we held that officers' separations based on two passovers for permanent promotion were illegal where the selection boards had not considered them on the basis of a record which portrayed their service careers on a 'fair and equitable basis' as the statutes, 10 U.S.C. §§ 3442(c), 8442(c), required. *Though we did not adopt Mt. Healthy's allocation of burdens of proof for military pay cases, we did implicitly follow Mt. Healthy in concluding that the doctrine of 'harmless error' applied and that the plaintiffs were not entitled to recover if there were no relation between the inaccuracy in their records and the decision not to promote them.*

*Doyle*, 599 F.2d at 995 (emphasis added). Thus, in this line of cases, the Court of Claims recognized that automatic reversal of the board's decision was not warranted. With respect to the court's conclusion that the *Mt. Healthy* framework did not apply, the Court finds these cases distinguishable on several grounds. First, it is important to point out that since *Sanders* and *Skinner* were decided, several courts have treated the "harmless error" test as identical to the same decision defense. *See, e.g., Christian*, 49 Fed. Cl. at 724–25 (referring to the " 'harmless error' rule of *Lesage* "); *Skinner*, 594 F.2d at 831 (stating that "[i]f there is to be such a showing to establish the defense of harmless error on defendant's part, it would more fairly belong to defendant-the party guilty of the

were in when the Supreme Court decided that the same decision defense was available to the defendants in those cases. Therefore, the Court finds that if the Army proves that the 1996 and 1997 boards would not have selected Saunders for promotion using valid criteria, then the Army would defeat his claims for liability. Now, as a practical matter, the fact that the Army destroyed the relevant selection files may prevent it from making the necessary showing. It does not, however, mean that as a matter of law the Army should be prevented from trying to do so.

Moreover, it is worth noting that in reaching this conclusion the Court took into account the distinct framework the Army uses in making promotions and the unique relationship between the judiciary and the military. With respect to the selection board process and the notion of promoting individuals based on a "whole-man" concept,[30] the Court finds that the same decision defense, while perhaps more difficult to apply in this context than in other settings, is nevertheless a valid method by which the Army can avoid liability. In reaching this conclusion, the Court finds that the applicability of the defense does not depend on the complexity of the selection process or the fact that

subjective criteria pervades the decision-making calculus. To be sure, in *Price Waterhouse*, the Supreme Court described the company's method of selecting partners as follows:

[A] senior manager becomes a candidate for partnership when the partners in her local office submit her name as a candidate. All of the other partners in the firm are then invited to submit written comments on each candidate-either on a 'long' or a 'short' form, depending on the partner's degree of exposure to the candidate. Not every partner in the firm submits comments on every candidate. After reviewing the comments and interviewing the partners who submitted them, the firm's Admissions Committee makes a recommendation to the Policy Board. This recommendation will be either that the firm accept the candidate for partnership, put her application on 'hold,' or deny her the promotion outright. The Policy Board then decides whether to submit the candidate's name to the entire partnership for a vote, to 'hold' her candidacy, or to reject her. The recommendation of the Admissions Committee, and the decision of the Policy Board, are not controlled by fixed guidelines: a certain number of

---

mistake in the first place. This is the rule in civilian pay cases. *Mt. Healthy City Board v. Doyle* [.]"). Second, in *Sanders*, the court found that explicitly using the shifting burdens of *Mt. Healthy* "would focus our attention on plaintiff's promotion rather than on the propriety of plaintiff's separation." *Sanders*, 594 F.2d at 815. At the same time, however, the court stated that "[t]his discussion in no way bears upon our attitude or the standards by which we would review a claim for promotion which was properly before the Court." *Id.* at 816 n. 13. In the instant case, the issue before the Court regards the plaintiff's claims for promotion rather than claims concerning separation from the military. Thus, this Court must focus on that precise issue. Third, in cases like *Sanders*, the problem with the selection process concerned er-

rors in the plaintiff's service records. In contrast, the instant case deals with an impermissible factor being included in the decision-making process. As noted above, the *Mt. Healthy* framework (including the same decision defense) is the applicable standard in such a case. Indeed, in cases like *Sanders*, the initial inquiry is whether the service records adequately reflect the individual's career performance in the military. No comparable inquiry can be made in a mixed motive case like the instant matter.

30. Under this concept, no single factor is determinative in the selection process. Individuals are promoted based on their entire records and any factor that may have affected those records is considered by the selection board.

positive comments from partners will not guarantee a candidate's admission to the partnership, nor will a specific quantity of negative comments necessarily defeat her application.

*Price Waterhouse*, 490 U.S. at 232–33, 109 S.Ct. 1775. Despite the highly subjective nature of and the many steps in this process, the Supreme Court deemed the same decision defense applicable. Similarly, in the context of college and graduate program admissions, selection committees consider, in addition to grade point average and standardized test scores, applicants' letters of recommendation, their extracurricular activities, personal statements or essays, and numerous other factors. Again, the Supreme Court has held that the same decision defense is available to the defendants in these cases as well. *Lesage*, 528 U.S. at 20–21, 120 S.Ct. 467. In this case, the Army's promotion process and the "whole-man" concept do not make the selection board's decision regarding Saunders so dissimilar from these other settings that they render the same decision defense inapplicable. These factors may make it more difficult for Army to sustain its burden, but there is no legitimate basis for finding the standard wholly inapplicable. Courts consider complex and technical issues all the time. Applying the same decision defense in this case is not any different. In the end, whether the defendant is considering which candidate to promote or which one to admit to

a graduate program, the goal is to select the overall best person for the position. Further, to the extent the Army does not want the Court delving into the secretive process of selection boards and its internal affairs, it can simply choose not to assert the defense. That is precisely what the Army did in *Christian*. In that case, there was no inquiry into the internal affairs of the review boards because the Army did not attempt to show that the original boards would have made the same decisions irrespective of the illegal factors. It is worth noting, however, that it is clearly "the duty of the federal courts to inquire whether an action of a military agency conforms to the law, or is instead arbitrary, capricious, or contrary to the statutes and regulations governing that agency." *Dilley*, 603 F.2d 914 (also noting that "courts have shown no hesitation to review cases in which a violation of the Constitution, statutes, or regulations is alleged."). Thus, while the Court is mindful of the relationship between the judiciary and the military, applying the same decision defense in this case will not result in overreaching.

**C. The Plaintiff's Facial Challenge [31] With Respect to the 1996 and 1997 Equal Opportunity Instructions**

**1. The Defendant's 1996 and 1997 Equal Opportunity Policies**

The defendant's equal opportunity instructions for both 1996 and 1997 were defined in DA Memorandum 600–2.[32]

**31.** *See* Amended Complaint, at 7 (stating that the defendant's equal opportunity instructions "both as set forth in writing and as actually interpreted and executed" violated the plaintiff's constitutional rights.) The Court will address this issue now because the mixed motive analysis does not apply to employment decisions made pursuant to a valid affirmative action policy. *Cf. Gilligan v. Dept. of Labor*, 81 F.3d 835, 839–40 (finding that "because the district court properly concluded that gender was only taken into account as allowed by

the affirmative action plan, the Department never considered gender illegally ... [and] the mixed-motive analysis is inapplicable."). Moreover, even if the other model applied, the Court would still have to consider whether the promotion decisions were made pursuant to a valid affirmative action policy. Thus, the Court will consider the issue at this time.

**32.** That is, both the 1996 Board and the 1997 Board were instructed to consider candidates, like Raymond Saunders, under the standards outlined in DA Memorandum 600–2.

That document contained extensive guidelines regarding the entire selection process, ranging from the oath each member had to take to the specific steps of the decisionmaking process. For the present purposes, four separate parts of the Memorandum are pertinent.

First, Section 8, entitled "Criteria for Selection," commands board members to "review the entire record" of each applicant, and not to let any "single factor" be "overriding." The section further provides that "[t]he decisions of the board will be weighed in terms of each officer's demonstrated character and performance and the potential of that officer for further outstanding service." In evaluating an applicant's "potential for further outstanding service," board members are directed to consider the applicant's "physical fitness", "[m]ilitary education and training", "[c]ivilian education and training", "[a]ssignment history and professional development", "[p]erformance", and "[p]rofessional attributes and ethics."

Second, Section 10 of DA Memorandum 600–2 is entitled "Equal Opportunity" and reads in full:

The success of today's Army comes from total commitment to the ideals of freedom, fairness, and human dignity upon which our country was founded. People remain the cornerstone of readiness. To this end, equal opportunity for all soldiers is the only acceptable standard for our Army. This principle applies to every aspect of career development and utilization in our Army, but is especially important to demonstrate in the selection process. To the extent that each board demonstrates that race, ethnic background, and gender are not impediments to selection for school command, or promotion, our soldiers will have a clear perception of equal opportunity in the selection process.

a. In evaluating the files of the officers you are about to consider, be alert to the possibility of past personal or institutional discrimination-either intentional or inadvertent-in the assignment patterns, evaluations, or professional development of officers in those groups for which you have an equal opportunity selection goal. Such indicators may include disproportionately lower evaluation reports, assignment of lesser importance or responsibility, or lack of opportunity to attend career-building military schools. Taking these factors into consideration, assess the degree to which an officer's record as a whole is an accurate reflection, free from bias, of that officer's performance and potential.

b. You have been given an equal opportunity selection goal at the applicable appendix. This goal will not be interpreted as guidance to meet a particular "quota." Comparison of tentative selection rates to the goal offers you a diagnostic tool to ensure that all officers receive equal opportunity in the selection process. You are required to review the records of those minority or gender groups that fall below the selection goal and look again for evidence of possible past discrimination that may have disadvantaged these officers. In any case where an indication of discrimination is found, you will revote the record of that officer, taking into consideration the apparent disadvantage, and adjust that officer's relative standing accordingly.

c. Prior to recess, review and report in the board report the extent to which minority and female officers were selected at a rate less than ... nonminority officers. Although the

board may have met the overall goals for minorities and women, it will identify any situation where a particular minority-gender subgroup did not fare well in comparison to the overall population. Explain such situations fully in the after-action report. Appendix I provides reporting requirements for equal opportunity results and issues.

Third, Section A–2 of Appendix A to DA Memorandum 600–2, which is entitled "Minority and female officers", reads as follows:

Your goal is to achieve a selection rate in each minority and gender group (minority groups: Black, Hispanic, Asian/Pacific Islander, American Indian, and Others; gender: males for Army Nurse Corps . . . and females for all other . . . categories) that is not less than the selection rate for all officers in the promotion zone (first time considered).[33]

Fourth and finally, Section A–10 of Appendix A instructs the board to "use the following general procedures" in the selection process:

a. Phase I (identify fully qualified officers in and above the zone.) The board will accomplish the following actions.

(1) Each board member will evaluate the entire record of each officer . . . and award a numerical score to assess each officers promotion potential. Additionally, identify any officer whose conduct or performance merits consideration for involuntary separation.

(2) Produce a single relative standing list of all officers . . . by merging board member's [sic] scores.

(3) Identify officers who are fully qualified and who are not fully qualified for promotion. Fully qualified officers are those, by definition, who demonstrated potential unequivocally warrants their promotion to the next higher grade. The term "not fully qualified" is not pejorative in nature. An officer who is not fully qualified for promotion may be qualified for duty in his or her current grade and career field.

(4) Set aside for further review the records of officers whose conduct or performance merits consideration for possible involuntary separation.

b. Phase 2 (identify potential [below the zone] selectees).

(1) Each board member will review the entire record of each officer from [below the zone] and identify officers who merit consideration for accelerated promotion. Additionally, identify officers who merit consideration for possible involuntary separation.

(2) For those officers selection for further [below the zone] consideration, each board member will award a numerical score to assess each officer's promotion potential.

(3) Produce a relative standing list of potential [below the zone] officers by merging board member's [sic] scores.

---

33. Roughly speaking, the "promotion zone" refers to a level of experience normally commensurate with promotion to a higher grade. Candidates "above the zone" are candidates who have already been considered for a promotion and denied. Candidates "below the zone" are candidates who show particular promise for early promotion despite the short length of their experience in the Army.

(4) Identify from the relative standing lists those officers who possess the potential for promotion ahead of their contemporaries, complying with your guidance regarding the minimum and maximum [below the zone] selections.

(5) Integrate the tentative [below the zone] selectees into the relative standing list of officers in and above the zone.

c. Phase 3 (identify those best qualified for promotion).

(1) based on the maximum selection capability, tentatively identify officers from the integrated relative standing list who are best qualified for promotion.

(2) Review statistical summaries of equal opportunity selections. Determine whether any goals, objectives, or requirements have not been met.

(3) Equal opportunity assessment.

(a) Your goal is to achieve a selection rate in each minority and gender group (minority groups: Black, Hispanic, Asian/Pacific Islander, American Indian, and Others; gender: males for Army Nurse Corps . . . and females for all other . . . categories) that is not less than the selection rate for all officers in the promotion zone (first time considered). You are required to conduct a review of files for the effects of past discrimination in any case in which the selection rate for a minority or gender group is less than the selection rate for all officers in the promotion zone (first time considered). This review is required even if the selection of one additional individual minority or gender group would result in the selection rate equal or great than the equal opportunity goal for the minority or gender group. If you find an indication that an officer's record may not accurately reflect his or her potential for service at the next higher grade due to past discriminatory practices-whether institutional or personal, deliberate or inadvertent-revote the record of that officer and adjust his or her relative standing to reflect the most current score.

(b) After completing any revoting of files, review the extent to which the equal opportunity selection goal was met. In cases where the goal has not been met, assess any patterns in the files of non-selected officers of that minority or gender group for later discussion in the AAR. Should you determine that any minority-gender subgroup did not fare well in comparison to the overall first time considered population, even if the minority or gender group did achieve the equal opportunity selection goal, conduct a similar reassessment of the subgroup for later discussion in AAR.

Thus, having reviewed the full content of the Army's promotion policy, the Court proceeds to determine whether the policy facially violates the United States Constitution.

## 2. The Constitutionality of the Defendant's 1996 and 1997 Policies

Under the Fifth Amendment, the federal government may utilize a racial classification if the government has a compelling interest and has narrowly tailored

its action to serve that interest. *See Adarand Constructors,* 515 U.S. at 227, 115 S.Ct. 2097. Similarly, the government may use a gender classification if the government has an important governmental objective and uses means that are substantially related to that objective. *See United States v. Virginia,* 518 U.S. 515, 532–33, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996).

 A government policy must do more than merely mention race or gender to amount to a racial or gender classification. It must be "preferentially favorable to one race [or gender] . . . for the distribution of benefits." *Raso v. Lago,* 135 F.3d 11, 16 (1st Cir.1998); *see also Hayden v. Nassau,* 180 F.3d 42, 48 (2d Cir. 1999). In the employment context, a policy preferentially favors a race or gender if the policy "oblige[s] [government actors] to grant some degree of preference to minorities [or a particular gender] in hiring." *Lutheran Church–Missouri Synod v. F.C.C.,* 141 F.3d 344, 351 (D.C.Cir.1998) (emphasis added). Looking at the totality of the defendant's promotion policy, the Court finds that the Army's policy obliged the selection board members to grant preferences in two different respects: (1) the initial evaluation procedure and (2) the review and revote procedure. The Court further finds that the administration of these preferences is not justified, in the case of race, by a compelling governmental interest, or in the case of gender, by an important governmental objective.

#### a. The Initial Evaluation Procedure

In referring to the "initial evaluation procedure," the Court refers to all procedures followed in phases 1, 2, and 3 where the selection board is instructed to review the applications and initially rank the ap-

plicants for promotion. *See* DA Memorandum 600–2, section A–10. The Court does not address in this section any policy concerning the "review and revote" procedure. The constitutionality of that policy is discussed separately below.

#### i. Racial and Gender Classifications

The initial evaluation procedure amounts to a racial and gender classification due to several factors. First and most obviously, DA Memorandum 600–2 states three separate times that there is a "goal" for the number of female and minority applicants promoted. *See* DA Memorandum 600–2, section 10, section A–2, A–10(c)(3)(a). Most blatant are the identical instructions contained in sections A–2 and A–10(c)(3)(a):

> Your goal is to achieve a selection rate in each minority and gender group (minority groups: Black, Hispanic, Asian/Pacific Islander, American Indian, and Others; gender: males for Army Nurse Corps . . . and females for all other . . . categories) that is not less than the selection rate for all officers in the promotion zone (first time considered).

DA Memorandum 600–2, section A–2. It is difficult to find a more direct statement of preference for minorities and females.[34] Although the instructions elsewhere order the board not to interpret the "goal" as "guidance to meet a particular 'quota,'" *see* DA Memorandum 600–2, section 10(b), a defendant may not cleanse a policy of an impermissible preference merely by disclaiming that preference. As this Circuit has explained in the employment context:

> "we do not think it matters whether a government hiring program imposes hard quotas, soft quotas, or goals. Any one of these techniques induces an em-

---

**34.** The Court recognizes that males applying for promotions in the nursing Corps are similarly situated to females seeking promotions in all other fields of the Army. See DA Memo-

randum 600–2, section A–2. Nonetheless, the Court refers to females alone in this and other instances for reasons of brevity and clarity.

ployer to hire with an eye toward meeting the numerical target. As such, they can and surely will result in individuals being granted a preference because of their race [or gender]."

*Lutheran Church*, 141 F.3d at 354. *See also Schurr v. Resorts Int'l Hotel*, 196 F.3d 486, 493 (3d Cir.1999) (stating that "[w]e are convinced, however, that in setting employment goals for women and minorities ... the regulations were intended to influence employment decisions generally and may, as here, affect concrete decisions[.]"); *Bras v. California Public Utilities*, 59 F.3d 869, 874 (9th Cir.1995) (finding that the government policy is "not immunized from scrutiny because they purport to establish 'goals' rather than 'quotas.' ").

The Court's conclusion in this regard is further strengthened by section 10(c) of the Memorandum. That section instructs the board to "identify" and "explain" "situation[s] where a particular minority-gender subgroup did not *fare well* in comparison to the overall population." DA Memorandum 600–2 section 10(c) (emphasis added). By ordering board members to "explain" themselves when they fail to promote enough females or minorities, the policy clearly implies that disproportionate promotion is in some way a disfavored result, one that constitutes a failure and should be avoided. This is also communicated by the use of the phrase "fare well"; implicit in the term "fare well" is the notion that there is somehow a deficiency in disproportionately lower minority and female promotion rates. While this might be true from a strict policy perspective, the Constitution prohibits the Army from using its policy view to encourage special treatment for minorities and females. This sense of deficiency, coupled with repeated proclamations of a promotion "goal," strongly suggests that the 1996 and 1997 selection board members felt "oblige[d]" to grant some degree

of preference to minorities [and females]" in the initial evaluation procedure. *Lutheran Church*, 141 F.3d at 351.

But the Court's decision does not rest on these points alone; a separate portion of DA Memorandum 600–2 explicitly instructs selection board members to grant a promotion benefit to females and minorities during the initial evaluation procedure. Section 10(a) instructs board members unequivocally:

> In evaluating the files of the officers you are about to consider, be alert to the possibility of past personal or institutional discrimination-either intentional or inadvertent-in the assignment patterns, evaluations, or professional development of officers *in those groups for which you have an equal opportunity selection goal.* Such indicators may include disproportionately lower evaluation reports, assignment of lesser importance or responsibility, or lack of opportunity to attend career-building military schools. Taking these factors into consideration, *assess the degree to which an officer's record as a whole is an accurate reflection, free from bias, of that officer's performance and potential.*

DA Memorandum 600–2, section 10(a) (emphasis added). Elsewhere in the Memorandum, the groups for which there is an "equal opportunity selection goal" are defined as "Black, Hispanic, Asian/Pacific Islander, American Indian, and ... males for Army Nurse Corps ... and females for all other ... categories." DA Memorandum 600–2, section A–2. Nowhere in the Memorandum are selection board officers obliged to consider the possibility of past discrimination for non-Nurse Corps males, whites, or any other group for which there is not an equal opportunity selection goal. Thus, the Memorandum instructs selection board members to, for example, account for an Hispanic applicant's "past personal

or institutional discrimination," but not to account for a white applicant's past discrimination. This undeniably establishes a preference in favor of one race or gender over another, and therefore is unconstitutional.[35]

This Court is not alone in concluding as such. In *Christian v. United States*, the Court of Federal Claims considered an early retirement selection process containing, almost word for word, the same instructions as in the instant case. For example, the relevant memorandum in that case proclaimed that:

> [t]he goal for this board is to achieve a percent of minority and female officers recommended for early retirement not greater than the rate for all officers in the zone of consideration.... This goal is not intended as guidance for you to meet any "quota."

*Christian v. United States*, 46 Fed. Cl. 793, 803 (Fed.Cl.2000). The memorandum further ordered the selection board to "consider that past personal and institutional discrimination may have disadvantaged minority and female offices" and to remember this "in evaluating [minority and female] officers' potential to make a continued significant contribution to the Army." *Id.* Finally, the memorandum ordered the board to "identify" and "explain" instances where a "particular minority-gender grouping did not fare well in comparison to the overall population." *Id.*

The *Christian* court found that the retirement instructions unquestionably amounted to a racial and gender classification. In concluding as such, the Court opined that the instructions clearly established a "race-based goal" and had board members "apply different standards when evaluating minority officers." *Id.* at 804. The Court further found the requirement that the board "fully explain" its failure to reach the retirement "goals" was "a coercive accountability measure, not an innocuous statistical compilation." *Id.*

The defendant relies heavily on the recent Federal Claims Court case, *Berkley v. United States*, 48 Fed. Cl. 361, 369 (Dec. 19, 2000). At issue in *Berkley* were the following instructions to the retirement board:

> Your evaluation of minority and women officers must clearly afford them fair

**35.** The defendant argues that the instruction to grant minorities special consideration for past discrimination applies only to the review and revote procedures, and not to the initial evaluation procedures. See Brief for Defendant, Mar. 19, 2001, at 33, 35. This argument is not supported by the text of DA Memorandum 600–2. Section 10 of the Memorandum, which enunciates the obligation to grant special consideration to certain minorities and females, does not explicitly identify the exact portion of the process to which it is meant to apply. However, paragraph (a) plainly suggests that such consideration is to be applied throughout the *entire* process. Section 10(a), sentence 1, reads:

> In evaluating the files of the officers *you are about to consider,* be alert to the possibility of past personal or institutional discrimination-either intentional or inadvertent-in the assignment patterns, evaluations, or professional development of officers in those

groups for which you have an equal opportunity selection goal.

DA Memorandum, Section 10(a), sentence 1. The unavoidable implication of the phrase "you are about to consider" is that the special consideration is meant to be applied through the evaluation process.

The defendant argues further that the Court, in *Sirmans v. Caldera*, 27 F.Supp.2d 248, 249 (D.D.C.1998), "has already found that the initial rankings of candidates by the selection boards .. did not, on their face, involve any requirement that could be characterized as preference for minorities or women." Brief for Defendant, Mar. 19, 2001, at 5. The Court made no such finding in *Sirmans*. The *Sirmans* opinion addressed a Rule 56(f) motion by the plaintiff, and the Court's cursory description of the selection process was for background purposes only. As such, it was in no way a "finding" or "holding."

and equitable consideration. Equal opportunity for all officers is an essential element of our selection system. In your evaluation of the records of minority and women officers, you should be particularly sensitive to the possibility that past individual and societal attitudes, and in some instances utilization of policies or practices, may have placed these officers at a disadvantage from a total career perspective.

*Id.* at 365. The *Berkley* court began its analysis by noting that the "mere mention of a race or gender" does not trigger heightened scrutiny. *Id* at 369. Rather, "government action must bestow a benefit or burden" based on race or gender. *Id.* at 369–70. The Court found that the government's instructions did not operate to benefit or burden a race or gender, but rather helped to ensure "a fair appraisal of a candidate's value so that the overall best qualified and suitable candidates may be selected." *Id.* at 371.

This Court need not express an opinion on the merits of the *Berkley* decision, as *Berkley* differs from the instant case in several important respects. First, and most importantly, the instructions in *Berkley* did not proclaim any "goals" with respect to females or minorities. In contrast, the instructions in the instant case *thrice* proclaimed an equal opportunity goal, and twice explained that goal as the achievement of "a selection rate in each minority and gender group . . . that is not less than the selection rate for all officers in the promotion zone." It would be quite strained indeed to interpret such explicit proclamations as nothing more than a reminder that certain that certain female or minority candidates may be more qualified than their military records suggest.

Second, the instructions in *Berkley* did not order the board to identify and explain instances where a "minority-gender subgroup did not fare well in comparison to the overall . . . population." In contrast, of course, the selection boards in the instant case were ordered to attend to this issue.[36]

Thus, consistent with the *Christian* decision, and not inconsistent with the *Berkley* decision, this Court finds that the defendant's initial evaluation procedure amounts to a racial and gender classification. This conclusion is based on the aggregate effect of the explicitly proclaimed promotion "goals," the explanation requirement, and the special consideration mandated for females and minorities. Taken together, these factors "oblige[ ] [the selection board members] to grant some degree of preference to minorities [or females] in [promotion]." *Lutheran Church*, 141 F.3d at 351, 141 F.3d 344.

### ii. The Defendant's Justification for the Racial Classifications

Given the racial classifications explained above, the initial evaluation procedure must satisfy strict scrutiny in order to be constitutional. *See Adarand Constructors*, 515 U.S. at 227, 115 S.Ct. 2097 (holding that "all racial classifications, imposed by whatever federal, state, or local governmental actor, must be analyzed by a reviewing court under strict scrutiny."); *University of California Regents v. Bakke*, 438 U.S. 265, 291, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978) (noting that "[r]acial and ethnic distinctions of any sort are inherently suspect and thus call for the most exacting judicial examination."). To withstand review under strict scrutiny, the racial classification at issue must be justi-

---

**36.** Furthermore, the court in *Berkley* explicitly distinguished the policy that it was reviewing from the one the court evaluated in *Christian*, which as noted above, is virtually identical to the instructions in this case. *Berkley*, 48 Fed. Cl. at 376 n. 7.

fied by a compelling governmental interest and the means chosen by the government to effectuate its purpose must be narrowly tailored to the achievement of that goal. *Adarand Constructors*, 515 U.S. at 227, 115 S.Ct. 2097 (recognizing that "such classifications are constitutional only if they are narrowly tailored measures that further compelling governmental interests."); *Wygant*, 476 U.S. at 273, 106 S.Ct. 1842 (noting that those "are the two prongs to this examination."). The standard applied by courts in reviewing racial classifications by the government does not change based on the race of a specific plaintiff. *Croson*, 488 U.S. at 494, 109 S.Ct. 706 (recognizing that the "standard of review under the Equal Protection Clause is not dependent on the race of those burdened or benefited by a particular classification.").

The Court finds that the racial classifications embedded in the Army's initial evaluation procedure are not justified by a compelling governmental interest.[37] At the outset it is important to note that the Army does not contest this conclusion. In defending its initial evaluation procedure, the defendant argued that the procedure *did not amount to a racial classification*. The defendant did *not* argue, however, that, in the event the Court found the procedure to classify along racial lines, it was nonetheless justified by a compelling governmental interest. To be sure, the

Army explicitly stated in its opposition to the plaintiff's motion for partial summary judgment that:

> In this case, the only candidate whom either the 1996 or the 1997 Board revoted was a white female. In view of this fact, any 'racial classification' that existed under the 1993 Policy is irrelevant to this case. What matters, instead, is whether the policy was valid insofar as it treated the sexes differently.

Def.'s Opp'n to Pl.'s Mot. for S.J. at 2. The Army's argument misconstrues the plaintiff's amended complaint and the inquiry conducted by this Court.[38] As noted above, the plaintiff alleges in his amended complaint that the initial evaluation procedure as well as the "review and revote" procedure creates racial classifications and are therefore subject to strict scrutiny review. Thus, the fact that the 1996 Board did not conduct a revote and the fact that the 1997 Board's revote did not concern minority officers does not defeat Saunder's claims against the Army that are based on racial discrimination. Furthermore, even if the Court were to assume that the Army had the same reasons for creating racial classifications as it proffers for establishing gender classifications, the Court would still find that the defendant does not have a compelling justification for having racial classifications in the initial evaluation procedure.[39]

**37.** As the Court finds that the defendant has not proffered a compelling interest to support its racial classifications, the Court need not-and will not-consider whether the racial classifications at issue narrowly serve that interest.

**38.** In this regard, the Court agrees with Judge Urbina's statement in *Adair v. England*, 2002 WL 27293 (D.D.C. January 10, 2002), that "[a]t times, reading the attorneys' briefs in this case is like attending a debate in which the participants have shown up in two different rooms. While the lawyers have clearly put significant time, energy, and thoughtful-

ness into their briefs, they sometimes fail to directly address the other party's key point." In the instant case, the attorneys' numerous briefs can fittingly be described as two ships quietly passing in the night.

**39.** The two primary reasons given by the Army to support the gender classifications are that they will create the perception of equal treatment and that they are necessary to redress the consistent underselection of women in the promotion process. The Court will assume *arguendo* that the Army has the same reasons for creating the racial classifications at issue in this case.

The Army's desire to create the perception of equal treatment is not an important enough governmental interest to justify the racial classifications in the initial evaluation procedure. *See* DA Memorandum 600–2 § 10 (stating that "[t]o the extent that each board demonstrates that race, ethnic background, and gender are not impediments to selection for school command, or promotion, our soldiers will have a clear perception of equal opportunity in the selection process."); Def.'s Opp'n to Pl.'s Mot. for S.J. at 4 (claiming that "the purpose of the 1993 Policy was to demonstrate to all members of the Army the degree to which the Army was committed to fair and equal treatment for all personnel."). First, it is worth noting the irony involved in the defendant's claim that the racial classifications in the initial evaluation procedure are meant to create the *perception* of equal treatment. Second, the court finds this justification to be far short of the level demanded for racial classifications. The underlying basis for this inadequacy is that perceptions are, of course, inherently subjective; thus, one person's perception of equal opportunity is another person's perception of outright discrimination. The instant case proves just that. Moreover, as the court noted in *Christian*, "[b]ecause of this inherent subjectivity, the thought management rationale may be used to exculpate almost any instance of racial discrimination while simultaneously avoiding any meaningful judicial scrutiny." *Christian*, 46 Fed. Cl. at 806. Third, courts have rarely, if ever, found a non-remedial interest to be a compelling interest on which to classify individuals along racial lines. *Wygant*, 476 U.S. at 275, 106 S.Ct. 1842 (recognizing the "Court's focus on prior discrimination as the justification for, and the limitation on, [the government's] adoption of race-based remedies."); *Hopwood*, 78 F.3d at 953 (concluding that "[e]ven if the law school's alleged current lingering reputa-

tion in the minority community—and the perception that the school is a hostile environment for minorities—were considered to be the present effects of past discrimination, rather that the result of societal discrimination, they could not constitute compelling state interests justifying the use of racial classifications in admissions."). As the Court stated in *Croson*, non-remedial classifications "may in fact promote notions of racial inferiority and lead to the politics of racial hostility." See *Croson*, 488 U.S. at 493, 109 S.Ct. 706; *Bakke*, 438 U.S. at 298, 98 S.Ct. 2733 (opining that "preferential programs may only reinforce common stereotypes holding that certain groups are unable to achieve success without special protection based on a factor having no relation to individual worth."). In this case, the Court finds that creating the perception of equality is not a sufficiently important non-remedial governmental interest for purposes of strict scrutiny review. Thus, the Court concludes that while creating the perception of equal treatment in the promotion process certainly is a laudable goal of the Army, it is not a compelling governmental interest justifying racial classifications in the initial evaluation procedure.

The Court also rejects the Army's contention that the racial classifications in the initial evaluation procedure serve to eliminate "the persistent under-selection of minority and female officers by Army selection boards." Def.'s Supplemental Opp'n to Pl.'s Mot. for S.J. at 5. Before explaining the basis for this conclusion, it is important to note that the interest that is almost always alleged in support of racial preferences—and is alleged by the Army in this case—is remedying past or present discrimination. *Ensley Branch, NAACP v. Seibels*, 31 F.3d 1548, 1565 (11th Cir. 1994). Further, courts have routinely accepted this interest as "compelling" for purposes of strict scrutiny analysis. *See*

*Wygant,* 476 U.S. at 286, 106 S.Ct. 1842; *United States v. Paradise,* 480 U.S. 149, 166, 107 S.Ct. 1053, 94 L.Ed.2d 203 (1987) (noting that "[t]he Government unquestionably has a compelling interest in remedying past and present discrimination by a state actor."). At the same time, however, courts have observed that "the purpose of strict scrutiny is to 'smoke out' illegitimate uses of race by assuring that the legislative body is pursuing a goal important enough to warrant use of a highly suspect tool." *Croson,* 488 U.S. at 493, 109 S.Ct. 706 (stating that "[t]he test also ensures that the means chosen 'fit' this compelling goal so closely that there is little or no possibility that the motive for the classification was illegitimate racial prejudice or stereotype."). Thus, when evaluating racial classifications under strict scrutiny, courts do not blindly accept this reason as compelling when it is proffered to sustain a racial classification. *Wygant,* 476 U.S. at 277, 106 S.Ct. 1842. Rather, "[e]videntiary support for the conclusion that remedial action is warranted becomes crucial when the remedial program is challenged in court by nonminority employees." *Id.* As the Supreme Court stated in *Wygant,* "[i]n such a case the trial court must make a factual determination that the employer had a strong basis in evidence for its conclusion that remedial action was necessary." *Id.; In re Birmingham Reverse Discrimination Litigation,* 20 F.3d 1525, 1544 (11th Cir.1994) (finding that the Supreme Court "requires a showing that the governmental unit involved engaged in prior discrimination, and requires a strong basis in evidence that remedial action is warranted, before allowing that governmental unit to execute an affirmative action plan remedying prior discrimination by using race in a narrowly tailored manner."). Thus, in the instant case, the Court's inquiry will not focus on whether the Army has a compelling interest in remedying past or present discrimination

since the Army, just like any other governmental entity, clearly does. Instead, the Court will examine the statistical and testimonial evidence submitted by the Army to determine whether there is a strong basis in evidence to support the Army's conclusion that remedial action was necessary to redress past or present discrimination in the promotion process.

In order to support its contention that there has been and still is discrimination against black officers in the Army, the defendant submitted an extract from an Army Research Institute publication entitled *Race Relations Research in the United States Army in the 1970's: A Collection of Readings.* After carefully considering the extensive statistical observations detailed in this report, the Court finds that it does not create a strong basis in evidence to support the Army's conclusion that remedial action in the form of racial classifications in the initial evaluation procedure is (or at least as of 1993 was) warranted. There are three reasons why the Court reaches this conclusion. First, the data used in conducting the statistical analyses described in this publication do not necessarily reflect conditions in the army in 1993. Rather, this report only "examines trends in selected personnel dimensions, using the data base for black personnel over a period of 20 years–1962 to 1982." The publication does not indicate whether there was discrimination against black officers in the Army from 1983 until 1993, when the policy at issue in this case went into effect. In order to support remedial action in the form of racial classifications, "the relevant governmental discriminator must prove that there are present effects of past discrimination of the type that justify the racial classifications at issue." *Hopwood,* 78 F.3d at 952. *See also Podberesky v. Kirwan,* 38 F.3d 147, 153 (4th Cir.1994) (noting that "[t]o have a present effect of past discrimination sufficient to justify the program, the party seeking to

implement the program must, at a minimum, prove that the effect it proffers is caused by the past discrimination and that the effect is of sufficient magnitude to justify the program."). The absence of data during the ten-year period preceding the 1993 Policy precludes the Court from finding a strong basis in evidence to support the remedial action in the policy. *Wessmann v. Gittens,* 160 F.3d 790, 802 (1st Cir.1998) (noting that "the mere fact that an institution once was found to have practiced discrimination is insufficient, in and of itself, to satisfy a state actor's burden of producing the reliable evidence required to uphold race-based action.").

The Second reason why the Court finds this publication insufficient to sustain the initial evaluation procedure is that the data and conclusions therein relate to the Army in general, rather than specifically to the JAG Corps. In evaluating the statistical evidence presented by the government to support remedial action in the form of racial classifications, courts do not consider generic findings of discrimination in a particular industry or by a specific governmental agency as a strong basis in evidence for concluding that remedial action is necessary. *Croson,* 488 U.S. at 498–500, 109 S.Ct. 706 (finding that "[t]here is nothing approaching a prima facie case of a constitutional or statutory violation by *anyone* in the Richmond construction industry.") (emphasis in original). As the Supreme Court noted in *Croson,* "a generalized assertion that there has been past discrimination in an entire industry provides no guidance for a legislative body to determine the precise scope of the injury it seeks to remedy." *Croson,* 488 U.S. at 498, 109 S.Ct. 706. In this case, even if the Army discriminated against black officers in general, it does not necessarily mean that black officers in the JAG Corps were discriminated against. *Cf. Edwards v. Houston,* 37 F.3d 1097, 1113 (5th Cir. 1994) (upholding consent decree where

"[t]he remedial promotions are only directed to those positions where the discrimination occurred."). A good way to illustrate this point is to consider female officers in the Army Nurse Corps. The fact that female officers may have been discriminated against in general does not mean that the Army discriminated against female officers in the Nurse Corps. To be sure, in the initial evaluation procedure the Army specifically provides that *male* officers should be provided the preferential treatment that female officers receive in other areas of the Army.

The third reason why the Court finds this report insufficient is because the conclusions contained therein do not represent strong or convincing evidence of past or present discrimination against black officers in the promotion process. In evaluating the results of the statistical tests, the editor of the report concluded that:

> In sum there was no difference in the speed of promotion to grades 02 and 03. Blacks were promoted to the grade of 04 faster than whites since 1980. Was this reverse discrimination or some form of compensatory action on the part of the system? There were differences in the speed of promotion of the senior officers, with the grade 06 showing the largest differences, which were only slightly decreasing over time. On the other hand, for 1983, there were no differences for the General Officer grades 07 and above. It is concluded, then, that there is still some degree of relationship between skin color and speed of promotion of officers, but that this relationship has been greatly reduced over the past 10 years.

*Race Relations Research in the U.S. Army in the 1970s* at 439. The Court concludes that these findings are not indicative of the type of "pervasive, systematic, and obstinate discriminatory conduct" that is necessary to justify a narrowly tailored race

based remedy. *Adarand Constructors,* 515 U.S. at 237, 115 S.Ct. 2097; *United States v. Paradise,* 480 U.S. 149, 168, 107 S.Ct. 1053, 94 L.Ed.2d 203 (1987) (finding that "in 37 years there had never been a black trooper at any rank" and that "out of 232 state troopers at the rank of corporal or above, *there is still not one black.*"); *Aiken v. City of Memphis,* 37 F.3d 1155, 1162–64 (finding that "although 14.3% of the fire privates were black, only 11 of 594, or 1.1% of the firefighters above that rank were black."). As such, it cannot sustain the racial classifications in the initial evaluation procedure.

■ In order to support its contention that there has been and still is discrimination against black officers in the Army, the defendant also submitted "tables that show, by racial and gender categories, promotion selection statistics for Army Competitive Category ('ACC') Colonel, Lieu-

tenant Colonel, and Major, respectively." Vollrath Declaration at ¶ 58. There are several reasons why the Court finds this statistical evidence insufficient to sustain the racial classifications in the initial evaluation procedure. First, when submitting statistical evidence, a party must make the evidence "meaningful to the trier of fact." *Frazier v. Consolidated Rail Corp.,* 851 F.2d 1447 (D.C.Cir.1988) (noting that "[s]tatistical calculations performed on data in discrimination cases are not probative of anything without support from an underlying statistical theory."). Simply presenting numerical compilations to the court is not sufficient. *Id.; Hatcher–Capers v. Haley,* 786 F.Supp. 1054 (D.D.C. 1992).[40] In the instant case, the Army has completely failed to articulate how this raw data should be interpreted and the reasons why it supports the racial classifications in the evaluation procedure.[41] Second, as

---

**40.** The Court recognizes that gross statistical disparities could, however, be sufficient. *Croson,* 488 U.S. at 509, 109 S.Ct. 706 (noting that "where there is a significant statistical disparity between the number of qualified minority contractors willing and able to perform a particular service and the number of such contractors actually engaged by the locality or the locality's prime contractors, an inference of discriminatory exclusion could arise."). The Army's statistics clearly do not rise to this level.

**41.** It appears that the Army actually submitted this data to support the declaration by General Frederick E. Vollrath. In his declaration, General Vollrath states that the selection boards have consistently failed to promote black officers at rates *comparable to* white officers and that he has "personally observed the kind of discriminatory assignment patterns, evaluations, and professional development opportunity patterns which Board members are instructed to consider in the EO assessment." Vollrath Declaration at ¶ 60. There are two problems with this declaration. First, despite his observations, General Vollrath states that the Army was "unable, however, to definitively pinpoint any single systematic reason for the disparity we ob-

served. It was because of this uncertainty that the Army instituted the EO 'review and revote' procedure." Vollrath Declaration at ¶ 62. This type of "uncertainty" clearly does not amount to the factual predicate necessary to sustain racial classifications in employment decisions. Second, with respect to his personal observations, the Court finds these statements analogous to those rejected by the Court in *Croson.* In that case, the Supreme Court found such "statements are of little probative value in establishing identified discrimination" in the particular area at issue. *Croson,* 488 U.S. at 500–501, 109 S.Ct. 706. The Court concluded that "[a] governmental actor cannot render race a legitimate proxy for a particular condition merely by declaring that the condition exists." *Id.See also Wessmann v. Gittens,* 160 F.3d 790, 808 (1st Cir. 1998) (noting that "only solid evidence will justify allowing race-conscious action; and the unsystematic personal observations of government officials will not do, even if the conclusions they offer sound plausible and are cloaked in the trappings of social science."); *Engineering Contractors v. Dade County,* 122 F.3d 895, 925 (11th Cir.1997) ("anecdotal evidence can play an important role in bolstering statistical evidence, but [ ]

discussed above, these statistics relate to the Army in general rather than to the promotion rate of minority officers in the JAG Corps. Even assuming that there is a statistical disparity between the promotion rate of black and white officers in the army, it does not mean that the disparity exists with respect to officers in the JAG Corps. Third, the Court finds that these statistics actually undermine the Army's position rather than supporting it.[42] The Army asserts that the promotion rate of black and white officers in 1992 not only shows that there is a disparity between the two, but also that it is indicative of the years prior to the adoption of the 1993 Policy. Vollrath Declaration at ¶ 59; Def.'s Supplemental Opp'n to Pl.'s Mot. for S.J. at 3. The promotion rate of black officers in the five years preceding the adoption of the 1993 policy, however, suggests that such officers were promoted at rates comparable to, and sometimes greater than, their white colleagues.[43] For instance, in 1989, 1990, and 1991, black officers were promoted to the rank of Colonel at a higher percentage than white officers were.[44] Further, in the other two years (1987 and 1992),[45] black officers were promoted to the rank of Colonel at only a slightly lower rate than white officers

were. The same holds true when evaluating the percentage of black officers promoted to the rank of Lieutenant Colonel. In 1989 and 1990, a higher percentage of black officers were promoted than white officers, and, in the other three years (1988, 1991, and 1992), black officers were promoted at only a slightly lower rate than white officers.[46] Perhaps even more telling, however, is that when aggregating the statistics over these five years it appears that a higher percentage of black officers were promoted to the rank of colonel than white officers (44.89% vs. 40.58%), and only a slightly lower percentage of black officers were promoted to the rank of lieutenant colonel (61.08% vs. 62.48%). Based on these observations, the Court finds that this data clearly does not rise to the level of "strong evidence," which is required to sustain a racial classification by the government. *Adarand Constructors*, 515 U.S. at 237, 115 S.Ct. 2097.[47]

In sum, the Army has not demonstrated that the racial classifications in the initial evaluation procedure are justified by a compelling reason. The Army failed to present strong evidence that remedial action in the form of racial classifications were appropriate in this case. As such, the Army has not satisfied the first step of

only in the rare case will anecdotal evidence suffice standing alone.").

42. In making these observations, the Court is not suggesting that black officers were treated equally or that these statistics support such a conclusion. Rather, the Court is finding that these statistics are insufficient to demonstrate the opposite conclusion (that black officers were discriminated against).

43. When the Court uses the term promotion rate with respect to these statistics, it refers to the percentage of individuals selected for promotion. These statistics do not indicate whether the individuals selected for promotion actually were promoted.

44. The Court assumes that the Colonel category corresponds to those individuals promot-

ed to that rank. To the extent it may mean individuals promoted from that rank to a higher rank, it does not change the Court's findings because while the rank would change the statistics would remain the same.

45. There is no data available for 1988.

46. The statistics concerning the promotion rate for black officers to the rank of Major, while somewhat less favorable, are consistent with the findings in these other ranks.

47. The Court has examined the other evidence submitted by the Army. The Court finds this evidence insufficient to sustain these classifications.

strict scrutiny. *Croson*, 488 U.S. at 510–11, 109 S.Ct. 706; *Bass v. Bd. of County Comm.*, 256 F.3d 1095, 1113–15 (11th Cir. 2001); *W.H. Scott Construction Co. v. City of Jackson*, 199 F.3d 206, 217 (5th Cir. 1999); *Eisenberg v. Montgomery County*, 197 F.3d 123, 128–29 (4th Cir.1999); *In re Birmingham Reverse Discrimination*, 20 F.3d at 1544. The racial classifications in the initial evaluation procedure are therefore unconstitutional.

### iii. The Defendant's Justification for the Gender Classifications

 Given the gender classifications explained above, the initial evaluation procedure must satisfy intermediate scrutiny to be constitutional. *United States v. Virginia*, 518 U.S. at 532–34, 116 S.Ct. 2264; *Nguyen*, 121 S.Ct. at 2059. To withstand review under intermediate scrutiny, the gender classification at issue must serve an important governmental objective and be substantially related to the achievement of that objective.[48] *Id.* In this case the Army has asserted two reasons for the gender classifications. The Court will address both in turn.

The Court finds that the Army's desire to create the perception of equal treatment is not an important government objective for purposes of intermediate scrutiny. As noted above, it is ironic for the Army to claim that the gender classifications in the initial evaluation procedure are meant to create the *perception* of equal treatment. Indeed, in *Alvin v. United States*, 50 Fed.

Cl. 295 (Fed.Cl.2001), the court stated that "we see the instructions instead as a directive to assign minorities and women candidates higher scores despite what may be lesser records of achievement. The outcome, however, is the same: the instructions employ 'a double standard-one for minorities and women; the other for white male officers." *Alvin*, 50 Fed. Cl. at 299. Moreover, while the government does not need to proffer as significant an interest to survive intermediate scrutiny as it does to withstand strict scrutiny, "the burden of justification is [nonetheless] demanding and it rests entirely on the" government. *Virginia*, 518 U.S. at 532–33, 116 S.Ct. 2264. *Cf. International Union v. Johnson Controls*, 499 U.S. 187, 111 S.Ct. 1196, 113 L.Ed.2d 158 (1991). In this case, the Army has done little to demonstrate how manipulating people's perception of how it treats its officers is an important governmental objective. The Army simply asserts that it is sufficient to withstand intermediate scrutiny. Notwithstanding these assertions, the Court concludes that while creating the perception of equal treatment is a laudable government objective, it cannot be the basis for creating the gender-based classifications in this case.[49] The inherent subjectivity involved in assessing an individual's perception means that this justification could be used to exculpate almost any instance of gender discrimination while at the same time avoid any meaningful judicial review. *Cf. Christian*, 46 Fed. Cl. at 806. The real interest

---

**48.** It is worth noting that while the Army does argue that the gender classifications in the review and revote policy satisfy intermediate scrutiny, it made no such argument with respect to the initial evaluation procedure. Nevertheless, the Court will consider the reasons articulated by the Army in the context of the initial evaluation procedure.

**49.** Even assuming *arguendo* that creating the perception of equal treatment is an important

government objective, the Court would still conclude that the equal opportunity policy cannot withstand intermediate scrutiny since creating a gender classification would clearly not substantially serve that interest. If anything, it would detract from other gender neutral efforts by the Army to create that perception. In short, the perception of equal treatment must be earned rather than created.

at stake goes much deeper than creating the perception of equal treatment; it is equal treatment.

The Court also rejects the Army's contention that the gender classifications in the initial evaluation procedure serve to eliminate "the persistent under-selection of minority and female officers by Army selection boards." Def.'s Supplemental Opp'n to Pl.'s Mot. for S.J. at 5. Before explaining the basis for this conclusion, it is important to point out that this frequently asserted objective is "unquestionably a sufficiently 'important' one to sustain a gender-conscious affirmative action program." *Engineering Contractors Assoc. v. Dade County*, 122 F.3d 895 (11th Cir.1997). As in the racial analogue, however, "the true test of [such] an affirmative action program is . . . not the nature of the government's interest, but rather the adequacy of the evidence of discrimination offered to show that interest." *Id.* In the context of gender conscious policies, the government does not have to show that there is a strong basis in evidence to support its conclusion that remedial action is necessary. Rather, in order to support a gender based affirmative action policy the government has to present "sufficient probative evidence of discrimination." *Id.* at 910. Although this standard lacks precise formulation, it does make clear that gender-based affirmative action policies must be "a product of analysis rather than a stereotyped reaction based on habit." *Id.*

The Court finds that there are two reasons why the Army Research Institute publication submitted by the defendant does not constitute sufficient probative evidence of discrimination (in the context of promotions) against female officers to support the gender classifications in the 1993 Equal Opportunity Policy. First, the temporal proximity of the data used in this research project is too far removed from the promulgation of the Army's initial eval-uation procedure to be sufficient probative evidence of discrimination. The data used in conducting these statistical tests is from the years 1974 until 1983, while the policy at issue in this matter was instituted in 1993 and the specific employment decisions were not made until 1996 and 1997. Even assuming that there was discrimination against female officers from 1974 until 1983, the Court finds that such evidence is too remote to demonstrate adequately discrimination against female officers in 1993 and beyond. The second reason why the Court rejects this study as demonstrating discrimination against female officers in the context of promotions is that the report actually concludes that in general women were promoted a faster rate than their male colleagues were. Specifically, the editor of the report found that:

> with the exception of grade 07, women officers have been promoted faster than their male counterparts in all grades, and that up to grade 06, the higher the grade, the faster the speed of promotion... In a similar fashion, [enlisted women] were also promoted faster in all grades. The speed of promotion to grades E8 and E9, although still faster than their male counterparts, has tended to decrease over the past 3 years. In general, women soldiers are promoted faster than their male counterparts.

*Race Relations Research in the U.S. Army in the 1970s* at 570. Thus, even assuming that this evidence was indicative of conditions in the Army in 1993, it simply does not support the Army's conclusion that gender-based classifications are necessary in the promotion process.

The Court also finds that the tables showing the promotion selection statistics for the ACC Colonel, Lieutenant Colonel, and Major are insufficient to sustain the gender classifications in the initial evaluation procedure. First, as noted above, the

party submitting statistical evidence must make that evidence meaningful to the trier of fact. Simply presenting numerical compilations to the court does not satisfactorily discharge that duty.[50] In this case, the Army provides absolutely no explanation regarding how this data supports the insertion of gender classifications into the initial evaluation procedure. In fact, the tables themselves do not even show how many male officers were considered for promotion in a particular year and how many were ultimately selected. Second, the Court finds that these statistics do not support the Army's contention that female officers were promoted at a lower rate than their male colleagues were. The Army asserts that the promotion rate of female and male officers in 1992 not only shows that there is a disparity between the two, but also that it is indicative of the years prior to the adoption of the 1993 Policy. Vollrath Declaration at ¶ 59; Def.'s Supplemental Opp'n to Pl.'s Mot. for S.J. at 3. The promotion rate[51] of female officers in the five years preceding the

adoption of the 1993 policy, however, suggests that such officers were promoted at rates comparable to, and sometimes greater than, their male colleagues. For instance, in 1987, 1989, 1990, and 1991, a greater percentage of female officers were selected for promotion to the rank of colonel than male officers. Further, when aggregating the figures for these five years (statistics are not available for 1988), female officers were selected for promotion at a higher rate than their male counterparts. The same holds true with respect to the promotion rate of female officers to the rank of lieutenant colonel. For instance, in 1989, 1990, 1991, and 1992,[52] a higher percentage of female officers were promoted than male officers. Although a higher percentage of male officers were promoted in 1988, an aggregation of the figures for these five years yields a higher percentage of female officers being selected for promotion than male officers being selected.[53] Based on these observations, the Court finds that these tables are not adequate to sustain the gender classifications in the

50. Specifically, in this case here may be a real problem concerning the sample size of the promotional group. Cf. White v. San Diego, 605 F.2d 455, 461 (9th Cir.1979) (agreeing with its earlier statement that "statistical evidence derived from an extremely small universe, as in the present case, has little predictive value and must be disregarded."); Haley, 786 F.Supp. at 1064. Moreover, even assuming there was (and is) a discrepancy between the rate of promotion for female and male officers, the Army has made no attempt to show that the difference is statistically significant. Cf. Frazier, 851 F.2d at 1451–52; Ottaviani v. State Univ. of New York, 875 F.2d 365 (2d Cir.1989). Both of these things also apply in the context of the racial classifications.

51. As noted above, in this context the Court is referring to the percentage of individuals selected for promotion.

52. The Court recognizes that 1992 is specifically referred to by the defendant as a year in which female officers were not promoted at a

comparable rate as male officers. Based on the Court's reading of the figures in the ACC table, in 1992 66% (68/103) of the female officers eligible for promotion were selected for promotion. In contrast, 62.9% (1151/1828) of the total number of eligible officers were selected for promotion. By subtracting the number of female officers promoted from the total number, it appears that only 62.7% (1083/1725) of the male officers eligible for promotion were in fact selected. The Court recognizes that these figures do not state how many officers of each gender were in the promotion zone. The lack of this information is attributable to the Army, however, and not the Court.

53. The statistics concerning the promotion rate for female officers to the rank of Major, while somewhat less favorable than the statistics cited above, are nonetheless consistent with the findings in these other ranks.

initial evaluation procedure.[54] That is, the Army has failed to demonstrate that the gender classifications were substantially related to an important governmental objective. As such, the initial evaluation procedure is unconstitutional for this reason as well.

### (b) The Review and Revote Policy

In referring to the review and revote policy, the Court refers to the following selection instructions contained in Phase 3:

> You are required to conduct a review of files for the effects of past discrimination in any case in which the selection rate for a minority or gender group is less than the selection rate for all officers in the promotion zone (first time considered). This review is required even if the selection of one additional individual minority or gender group would result in the selection rate equal or great than the equal opportunity goal for the minority or gender group. If you find an indication that an officer's record may not accurately reflect his or her potential for service at the next higher grade due to past discriminatory practices-whether institutional or personal, deliberate or inadvertent-revote the record of that officer and adjust his or her relative standing to reflect the most current score.

*See* DA Memorandum 600–2, section A–10(c)(3)(a). The Court finds that these instructions, alone and independent of the instructions discussed above, constitute a racial and gender classification.

### i. The Racial and Gender Classifications

The Court need not engage sophisticated interpretation to determine that the review and revote procedure "oblige[s] [board members] to grant some degree of preference to minorities [and females] in [promotion]." *Lutheran Church,* 141 F.3d at 351. The instructions explicitly ordered the board members to "adjust [the] relative standing" of any minority or female applicant whose "record may not accurately reflect his or her potential for service ... due to past discriminatory practices." Nowhere in DA Memorandum 600–2 is a board member instructed to "adjust the relative standing" of a male or non-minority applicant who has been subject to past discrimination. This unquestionably amounts to a racial and gender classification.

### ii. The Defendant's Compelling or Substantial Interests

Finding that the review and revote procedure amounts to racial and gender classifications, the Court next takes up the question of whether the classifications are predicated on a sufficient governmental interest. The Court concludes that to the extent the Army could not sustain either the racial or gender classifications in the initial evaluation procedure, it similarly cannot sustain the classifications in the review and revote policy. Accordingly, the Court finds that this policy is unconstitutional for this reason as well.[55]

---

**54.** The Court has examined the other evidence presented by the Army in this matter. It nevertheless concludes, however, that this evidence is also insufficient.

**55.** To the extent the Army's equal opportunity policy unjustifiably provides a benefit to minority and female officers during the promotion process, it is unconstitutional in every application and under every set of conceivable circumstances. Even assuming that it was constitutional to consider the fact that a particular candidate has endured discrimination, that consideration would have to, at a minimum, be given to *all* officers to pass constitutional muster. Under DA Memorandum 600–2, that clearly was not done. Thus, the fact that a specific candidate may have actually been subject to discrimination would not make the policy constitutional. *City of Chicago v. Morales,* 527 U.S. 41, 119 S.Ct. 1849, 144 L.Ed.2d 67 (1999); *Rust v. Sullivan,* 500 U.S. 173, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991).

138

### III. ·CONCLUSION

For the reasons stated herein, the Court finds that the plaintiff has no standing to challenge the selection board composition, but does have standing to seek retrospective relief with respect to the selection process. The Court further holds that the defendant's promotion selection procedures facially violate the Fifth Amendment as described herein. This finding alone, however, does not entitle the plaintiff to summary judgment on the issue of liability. The defendant must be given the opportunity to prove that the plaintiff would not have been promoted under race and gender neutral criteria. To the extent that both parties were somewhat unsure of their respective burdens in this case, the Court will, as noted above, permit the Army to attempt to make this showing after discovery is complete.